7005

*EX PARTE* BERGER, *IN RE* LIVINGSTAIN v. COLUMBIAN
BANKING AND TRUST CO.

Banks—Depositor—Trust—Subrogation—Debtor and Creditor.—Where
a depositor in consequence of rumors of the insolvency of a bank
draws out his deposit, but while it is being paid to him, in response
to his inquiries, he is assured by the officers the bank is solvent, and
the circumstances surrounding him there bear out this statement, and
he in good faith uses the money just paid to him by the bank in
buying a draft drawn in his favor by this bank on its correspondent
with which it had on deposit certain collateral, to secure its note
and drafts, the fund so drawn out is not impressed with a trust in
favor of general creditors, but the holder of the draft is entitled
to be subrogated to the rights of the drawee in the security held
by it.

Mr. Justice Woods *dissents.*

Before Memminger, J., Charleston, January, 1907.
Reversed.

Petition by Martin K. Berger, *in re* Harris Livingstain,
against Columbian Banking and Trust Company. From
circuit order refusing the petition, petitioner appeals.

*Messrs. Legare, Holman & Baker,* for appellant, cite: 77
S. C., 305.

*Mr. Benj. H. Rutledge,* for receivers, contra, cites: Perry
on Trusts, 487.

September 3, 1908. The opinion of the Court was deliv-
ered by

Mr. Justice Gary. The record contains the following
statement:

"After the Supreme Court of this State filed its opinion,
in the case of *Livingstain* v. *the Columbian Banking and
Trust Co.,* 77 S. C., 305, 57 S. E., 182, the said Martin K.
Berger filed his petition and affidavit, setting forth that he

came within the exception, as recognized in said decision, and was entitled to subrogation, for that he obtained New York exchange, drawn on the National Bank of Commerce, for and in consideration of cash money paid into the bank. The defendant's receivers controverted the position of Berger, and gave a different version of the position under which the said New York exchange was obtained. His Honor, Judge Gage, presiding, said that he could not determine the question on affidavits, and, therefore, referred the matter to G. H. Sass, Esq., one of the masters of said county, to take the testimony and report conclusions of fact thereon, with all reasonable dispatch. The master made his report, stating and setting forth his findings of fact, and no exception was taken thereto. That the bank was not put in the hands of a receiver until the 9th day of February, 1906."

The master's findings of fact are as follows:

"That the petitioner, Martin K. Berger, holding along with his wife certain deposits in the Columbian Banking and Trust Company, and being advised by rumors that the affairs of the bank were in an unsatisfactory condition, determined to withdraw the said deposits, and that on the 8th of February, 1906, he sent his wife to the bank with the two checks, representing their combined deposits, and amounting to $2,015.75.

"Mrs. Berger presented the checks at the teller's window, and the same were paid to her in about one-fourth in currency and the balance, $1,500, in three bags of silver dollars, containing $500 each. Finding that the silver was too heavy for her to remove, she called to her husband, who had by this time reached the bank, and turned the money over to him. He received the same from the teller.

"The testimony is conflicting as to whether he removed the money from the window and carried it to another counter to count it, but there is no doubt at all that he did receive the money and did count the currency. After having thus received the money from the bank. he resolved to

exchange the same for a check on New York, and paid the money back to the teller and requested that he would give him a New York check for the amount.

"This was done, and the said check upon New York was taken by Mr. Berger to the Bank of Charleston on the same day and deposited to his account in that bank.

"I find that there were two separate and distinct transactions; that is to say, that the depositor's check was paid by the bank in the manner above stated, and that transaction closed, and that, immediately thereafter, the New York check was purchased with the same money which had been paid to Mr. Berger upon the depositor's checks."

In refusing the petition his Honor, the presiding Judge, assigned the following reasons:

"The bank was insolvent when Berger put his money back there, and it became again an asset available to all, to be distributed among them, under high principles of equity and justice. It has judicially been determined that the bank was insolvent on February 8, 1906, the date of this Berger transaction; therefore, all its assets constituted a trust fund and could not lawfully be paid over to any one certain creditor in preference to others. Berger heard rumors of the insolvency, and, acting on that belief, went to draw out his money, and received the amount of his deposit. The money he received was not held by him, as an innocent outside customer of the bank, but was really part of a trust fund, which was the property of all the creditors, therefore, he was not within the exception set forth from the case cited (77 S. C., 305).

"Under the statute in bankruptcy any payment to a person having reason to believe that the payer is insolvent is a void act; equity will not go beyond this principle. Berger never parted with the money, so that its identity was lost; the identification of the money is important here, because it affects the bank with knowledge that the money for which it exchanged the New York draft was not 'cash paid into

the bank,' but was really the money of the general depositors, part of a trust fund, which the bank had no right to appropriate to Berger's check."

The assignments of error is as follows:

First. "Because his Honor erred in dismissing the petition of the said Martin K. Berger, in that the undisputed testimony showed, from the report of the master, that Martin K. Berger paid into the Columbian Banking and Trust Company the sum of two thousand and fifteen dollars and seventy-five cents ($2,015.75), and obtained from said bank a check on New York, drawn on the National Bank of Commerce, and that the same was drawn to his order by said bank, in good faith and without any knowledge on the part of the said Martin K. Berger that the said bank was insolvent, and that, therefore, the said Martin K. Berger was subrogated to the right of the National Bank of Commerce to the collateral which it held to secure a note, which was discharged by applying money against which this check was drawn in favor of Martin K. Berger.

Second. "Because his Honor erred in holding that the Columbian Banking and Trust Company was insolvent when Berger put his money back there, and that it became again an asset of the bank, for the purpose of distribution among the creditors and depositors of the bank, 'under high principles of equity and justice;' whereas, his Honor should have held and found that Berger did not put his money back into the bank, but, on the contrary, that he purchased in good faith, while the bank was a going concern, New York exchange for two thousand and fifteen dollars and seventy-five cents ($2,015.75), and that he should have been held subrogated to the assets, held by the National Bank of Commerce, to the collaterals which were deposited as a security to a note, the money on which said check being drawn having been exhausted in the payment of said note.

Third. "Because his Honor erred in holding and concluding that the money received by Berger from the bank on his

check, while it was a going concern, was a part of the trust fund, which was the property of all the creditors.

Fourth. "Because his Honor should have held and concluded that when Berger drew his money out of the bank, while it was a going concern, that he had a right to do so, and that after it was withdrawn from said bank it was not impressed with any trust or equity, in favor of the other depositors of the bank, and that Berger had a right, if he saw fit, to purchase said New York exchange.

Fifth. "Because his Honor erred in holding that the Columbian Banking and Trust Company was judicially determined to be insolvent on the 8th day of February, 1906, the date that Berger obtained New York exchange; whereas, on the contrary, said bank was not adjudged insolvent until the 9th day of February, 1906; and there is no evidence going to show any knowledge or notice of such insolvency, further than a reported rumor that the bank was in an embarrassing condition."

The vital question in the case is whether the money, when paid to the petitioner by the bank, was impressed with a trust.

His Honor, the presiding Judge, based his conclusion on two grounds: (1) The insolvency of the bank and (2) that "Berger heard rumors of the insolvency, and, acting on that belief, went to draw out his money, and received the amount of his deposit."

The Circuit Judge should also have found, from the uncontradicted testimony, that, conceding there was enough to put the petitioner on inquiry, he followed it up with due diligence by going to the proper sources of information, the officers of the bank, and became satisfied that the bank was solvent.

M. K. Berger, the petitioner, testified: "I had a conversation with several of the men, one of which was Mr. Pearlstine, and several others, who knew the circumstances of the bank; and they assured me that they would pay out every

dollar to the depositors. * * * I took it (the money) from the window and counted all the money, the paper money; then I started to count the silver; then I decided to help out the bank, and I asked the cashier of the bank, Mr. Seel, to be so kind as to give me a New York exchange for the money, which I paid him in cash. * * * Q. They had satisfied you about the solvency of the bank? A. Yes, sir. * * * Q. About what time of day did you get this money? A. About 10:30, I think. Q. And the bank did not close until next day? A. I think so."

Mrs. Bessie Berger, wife of the petitioner, testified as follows: "Q. Do you remember whether anybody went to the window after Mr. Berger left? A. Why, yes; plenty of people went to the window. Q. Did anybody go to the teller's window, between the time that Mr. Berger took the money to the teller's window and brought it back? A. Yes. Q. They were paying out to everybody? A. Yes. Q. Looked like the bank had plenty of money? A. Yes, had plenty of money; and one of the officers came there and he said: 'We have all the money to pay you off; there is too much excitement here.' Also Mr. Pearlstine came there, and he said: 'Don't you all rush; just take your time, and we will pay you all.' "

F. J. Seel, cashier, testified as follows: "Q. Do you remember what day there was a run on the bank? A. It started on the 6th and wound up on the 8th. Q. You were engaged in paying over money on the 8th? A. Yes. * * * Q. What time of day was that (payment to the petitioner)? A. That was about half-past eleven. Q. The bank closed when? A. When it had no more money to pay. Q. It stopped paying and put up the sign thirty days? A. It stopped paying about twelve; I do not know what hour the sign was put up. Q. About twelve or one o'clock you stopped paying? A. We stopped paying everybody; we had no more money."

The testimony does not show that the payments were made under the belief that the bank was insolvent, nor in contemplation of insolvency, nor with a design to give a preference, to those receiving payment, over the other creditors of the bank, but with the expectation that the bank would be able to continue business.

On the contrary, the *bona fides* of the petitioner was clearly established, and his confidence in the solvency of the bank was shown by the fact that he deposited his money with it, after the assurance of the officers that all would be paid; after knowledge of the fact that the bank had stood the run upon it, from the 6th to the 8th; after seeing that the bank was conducting its business in the usual way,—paying the drafts over the counter in the order in which they were presented,—and after determining that he would assist in restoring confidence in others, and thereby enable the bank to meet all demands.

"A bank is insolvent when from the uncertainty of being able to realize on its assets, in a reasonable time, a sufficient amount to meet its liabilities, it becomes necessary for the control of its affairs to pass out of its hands." 3 Enc. of Law, 847.

"The keeping of the bank open, and the conducting of its business in the usual manner, constituted a representation to its customers of the solvency of the bank, upon which they had a right to rely; and if the bank was known to be insolvent by the officers who were charged with its management, the concealment of that fact from a person about to make a deposit would constitute a fraud upon him. The title acquired by the bank to the money and checks, deposited under such circumstances, would be voidable at the election of the depositor, who could bring suit to recover his deposit without any previous demand. The bank would become a trustee *ex maleficio,* and would hold the deposit for the use of the depositor and subject to his right of reclamation." *Wasson* v. *Hawkins,* 59 Fed. Rep., 233.

In the case of *McGregor* v. *Battle,* 13 L. R. A. (N. S.), 185, 128 Ga., 577, the rule·is stated that if a bank, though insolvent, is still conducting its business, and pays a check of a depositor, in the usual course of business, and the depositor had no notice of the insolvency of the bank, the payment is good and the depositor will be protected. If, however, the depositor is paid, not in the usual course of business, but at a time when he has notice or knowledge that the bank is insolvent, and that the intent of the bank is to create a preference in his favor over other creditors, the payment is not good." (Syllabus.)

In that case the Court uses this language: "It is a well-known fact that the suspicion that a bank is insolvent causes all depositors who are acquainted with the facts leading to the suspicion to rush at once and withdraw their deposits. A run on a bank is always produced by those who think they have reason to suspect that the bank is in a failing condition; and we are not prepared to hold, if a bank is still in operation, open during the usual hours of business, paying its checks in the order in which they are presented, according to the custom of the bankers, that a depositor who merely had reason to suspect the solvency of the bank, this being the motive for his drawing a check, would be required to repay to the bank the amount so withdrawn, less what would be his *pro rata* share in the assets of the bank, on the day that the amount was withdrawn, in the event that the bank was afterwards forced to liquidation, and was, in fact, insolvent. Neither are we prepared to hold that one who actually knows that a bank is insolvent, but does nothing except to draw his check and present it, and receive payment over the counter, in the usual course of business, would be required to refund the amount so withdrawn, less his *pro rata* share, upon a final winding up of the affairs of the bank."

Even under our assignment law against undue preferences (Code of Laws, section 2647), the question whether

the payment made by the debtor is obnoxious to the statute depends upon the intention of the parties to create a preference, and the foregoing facts would not render the payment illegal. *Porter* v. *Stricker,* 44 S. C., 183, 21 S. E., 635.

Having reached the conclusion that the money, when received by the petitioner, was free from a trust, the case comes within the principle announced by Mr. Justice Woods, in *Livingstain* v. *Banking Co.,* 77 S. C., 305, 57 S. E., 182: "Had the check been issued for cash paid into the bank, or before insolvency, the other depositors could have interposed no countervailing equity, and the petitioners would have been subject to subrogation."

It is the judgment of this Court that the judgment of the Circuit Court be reversed and the case remanded for such proceedings as may be necessary to carry into effect the views herein expressed.

MR. JUSTICE WOODS, *dissenting.* I think the judgment of the Circuit Court is sustained by the principles stated and the reasoning of the Court in the former appeal, 77 S. C., 305, 57 S. E., 182. The facts are exactly the same as there appeared, except that Berger has since filed another petition and under it has shown that instead of taking from the Columbian Bank a check on the Bank of Commerce, in direct payment of his deposit, he received from the Columbian Bank the cash for it; and almost immediately, without leaving the bank, paid it back to the Columbian Bank, taking in its place the check on the Bank of Commerce.

The question is whether, under these circumstances, the bank being insolvent at the time and its assets being now in the hands of the Court for ratable distribution among all creditors, Berger must be held to have an equity against the depositors to the collateral held by the Bank of Commerce. It is argued this conclusion results from the words italicized below, taken from the opinion in the former appeal: "Therefore, the issuing of the checks to these depositors was inequitable with respect to other depositors, because the bank was

actually then insolvent and all of the depositors had the equity of equal distribution of the assets, including any surplus arising from the collateral held by the Bank of Commerce. The right of the Columbian Bank is not in question, and with that the Court will not interfere, but it is very clear that the Court should not stretch out its arm and by affirmative action, under the guise of subrogation, confer on the petitioners a lien on the collateral, thus defeating equitable distribution among all of the creditors to promote an inequitable preference. *Had the checks been issued for cash paid into the bank, or before insolvency, the other depositors could have interposed no countervailing equity, and the petitioners would have been entitled to subrogation.* But the insuperable objection to subrogation in the case, as presented, is the fact that the checks were issued in payment of the debts of the bank after insolvency, and when the Court, at the very moment they were issued, would have taken charge of the bank's assets, and would have enjoined the issuing of the checks to the end that an equal distribution should be made among creditors without preference to any." 77 S. C., 311, 57 S. E., 182.

The context shows the Court in the sentence relied on was laying down the general proposition, that if the isolated fact had appeared that these parties, in the ordinary course of business, had paid their money to the Columbian Bank for the purchase of checks on the Bank of Commerce, then they would have been entitled to be subrogated to the rights of the Bank of Commerce in the collateral held by that bank. But much more that is vital appears here than the mere isolated fact that the petitioner purchased a check for cash.

The court of equity looks through the form to the substance, takes into account all the circumstances, and from all the facts determines the nature of the transaction and the rights of the parties. It may be assumed that Berger actually drew his deposit in cash from the bank; that he did not know the bank was insolvent, and that he could not have

been compelled to refund the money so drawn to the receivers, though there was a run on the bank at the time. Yet it does not follow from all this that substantial justice requires that he should receive at the hands of the court of equity the special consideration of subrogation against the interests of other creditors.

It is always to be borne in mind that Berger, as holder of the check, has no legal right whatever to the collaterals in question. For him to induce the Court to take them from the receivers and bestow them upon him, he must convince the Court he ought to have a preference in equity and good conscience. It may be the Court could not have found warrant in the statute law, or common law, or even under the principles of equity, to take away from a depositor the preference he obtains when payment is made to him under such circumstances; but it by no means results that the Court will set aside legal rights to aid such a preference.

When petitioner's deposit was paid to him the bank was insolvent; that is, in the condition in which the principles of equity required a ratable distribution among all its creditors, with preference to none, of all its assets, including the money representing petitioner's deposit, which was paid to him.

The repayment by Berger of the money into the bank for the check was merely an immediate restoration of conditions which enabled the Court to carry out the principle and policy of equity to require equal distribution.

Subrogation is a pure unmixed equity, having its principles not in any fixed law, but in the principles of natural justice. *Gadsden ads. Brown,* Speer's Eq., 41; *Ex parte Reynolds,* 99 Am. St. Reports, 480. The proposition to allow to the defendant the advantage of subrogation, therefore, means that natural justice requires a court of equity to stretch out its arm to make to one creditor of a bank a preference over all others, to which he had no legal right. The equity of equal distribution is the paramount equity, but, regarding the equities equal, the legal right represented

by the receivers should prevail. *Galphin* v. *McKinney*, 1 McC., 280.

At the moment of insolvency of the bank substantial justice, which in this case is that equality which equity always seeks to enforce, required ratable distribution of the assets. The payment to Berger of his deposit operated as a preference, whether unlawful or not, and tended to defeat the equity, the substantial justice of ratable distribution.

Looking at the transaction as a whole, therefore, the petitioner's contention comes to this: A preference over other creditors of an insolvent bank was obtained, which a court of equity would have enjoined with the real facts before it. After that preference, and by virtue of it, and with the funds obtained through it, a check was issued on the Bank of Commerce, which was in effect a second assignment of funds of the Columbian Bank held to its credit by the Bank of Commerce. But this check amounted to nothing in law, because the prior claim of the Bank of Commerce had absorbed the fund on which it was drawn. Nevertheless, the court of equity is asked to make good the preference it would have refused to allow by subrogating to the payment of the check the collateral held by the Bank of Commerce, now in the hands of the Court for the administration of the equity of ratable distribution.

It seems to me the statement of the proposition carries its refutation.