## McDONALD, Receiver, *v.* CHEMICAL NATIONAL BANK.

### APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 242. Argued April 13, 1899. — Decided May 22, 1899.

The several payments and remittances made to the Chemical Bank by the Capital Bank before its insolvency were not made in contemplation of insolvency, or with a view to prefer the Chemical Bank.

These cheques and remittances were not casual, but were plainly made under a general agreement that remittances were to be made by mail, and that their proceeds were not to be returned to the Capital Bank, but were to be credited to its constantly overdrawn account; and when letters containing them were deposited in the post office, such mailing was a delivery to the Chemical Bank, whose property therein was not destroyed or impaired by the insolvency of the Capital Bank, taking place after the mailing and before the delivery of the letters containing the remittances.

In January, 1896, Kent K. Hayden, as the duly appointed receiver of the Capital National Bank of Lincoln, Nebraska, filed in the Circuit Court of the United States for the Southern District of New York a bill of complaint against the Chemical National Bank of New York.

The bill alleged that the Capital National Bank, on the 21st day of January, 1893, was insolvent and stopped doing business, and that on the 22d day of January, 1893, the Comptroller of the Currency closed said bank and took possession of its assets and affairs; that for a period long prior to the 15th day of January, 1893, the said bank was insolvent, and its insolvency was known to all its officers; that ever since the 2d day of June, 1884, there had been mutual and extensive dealings between the two banks above named, in which each had acted for the other, as correspondent banks do, for the making of collections and the crediting of the proceeds thereof; that the Capital National Bank kept an active deposit account with the defendant, and that settlements on the basis of such accounts were made at periodic times during all said period, and any balance after the correction of errors, mutually agreed to be charged or credited, was at such periods credited or debited, as the fact might be, upon the books of each of said banks to a new account, and the prior accounts thereby and in that manner adjusted and settled.

That the defendant bank had refused to pay or honor the drafts drawn upon it by the Capital National Bank presented on or since January 21, 1893; that since January 22, 1893, the defendant bank had received many and large sums of money belonging to and for the account of the Capital National Bank, some of it being the sums of $2935.60, $815.79 and $735, from the officers of the Capital National Bank, and the rest from the third parties which remitted the same to the defendant for account of the Capital National Bank, and that, in particular, it had received on January 23, 1893, five thousand dollars from the Packers' National Bank, and two thousand dollars from the Schuster Hax National Bank, and divers other sums from others, on that day and since; that the defendant had refused to account for and pay over to the complainant the said collections. Wherefore it was prayed that an accounting be had, and that the defendant be ordered to pay over what might be thereby found due.

The defendant bank answered, admitting the preliminary allegations of the bill, but denying its knowledge of the

insolvency of the Capital National Bank on or prior to January 21, 1893, but averring that up to the 23d day of January, 1893, it was informed and did believe that the said Capital National Bank was entirely solvent, and dealt with it and gave it credit as a solvent bank.

The answer denied that on and after January 21, 1893, it had ceased to pay and refused to pay all drafts drawn upon the defendant by the Capital National Bank, but admitted that on the 23d day of January, 1893, because of information then for the first time received of the struggling condition of said bank, the defendant bank did refuse to pay the drafts of the Capital National Bank, which was then indebted to the defendant in the sum of at least $13,992.93 on balance of account, besides large amounts of negotiable paper, indorsed by the Capital National Bank, then held by and previously purchased or discounted by the defendant bank, and the proceeds of which had been credited to the account of the Capital National Bank — all of which transactions were averred to have been made in the usual course of business between the banks, and without any knowledge, notice or belief on the part of the defendant bank that the Capital National Bank was insolvent or in any danger of becoming so.

The answer denied that the defendant had, since January 22, 1893, received many and large sums of money belonging to and for account of the Capital National Bank, but admitted that since January 21, 1893, it had received certain remittances and payments in the form of cheques or drafts, for account of the Capital National Bank, all which it had placed to the credit of the Capital National Bank, which had left the Capital National Bank indebted to the defendant bank in a large sum, in the form of balance of account and negotiable paper indorsed to the defendant by the Capital National Bank; and the answer alleged, on information and belief, that said remittances and payments were made by the Capital National Bank, or by other banks and bankers, by the direction and order of said Capital National Bank, through the United States mails, and were so ordered, made and remitted

before the appointment of any receiver for said Capital National Bank, and before it ceased to pay its obligations or had suspended its usual and ordinary banking business, and that said remittances by said Capital National Bank, or by other banks and bankers, by it ordered to be made to the defendant, were made in the ordinary and accustomed course of business between the defendant and the Capital National Bank, and when received by the defendant were by it placed to the credit of the Capital National Bank.

The answer admitted that it had received the sums of $2935.60, $815.79, $735, $5000 and $2000 on the 23d day of January, 1893; that the said sums of $2935.60 and $815.79 were remitted to the defendant on or about the 19th day of January, 1893, and the said sum of $735 on or about the 20th day of January, 1893, by the said Capital National Bank, which, on said respective days, deposited and delivered the same in the United States mail, in letters addressed to the defendant, in the usual and accustomed course of business, and before said Capital National Bank had suspended payment or stopped business, and before it was taken charge of by the receiver; that the said sum of $5000 was remitted to the defendant on or about the 19th day of January, 1893, by the Packers' National Bank, and the said sum of $2000 was remitted to this defendant by the Schuster National Bank on or about January 19, 1893, by being by said banks respectively deposited in the United States mail, in letters addressed to the defendant, in the usual course of business, and before the Capital National Bank suspended payment or stopped business, and before it was taken charge of by the receiver. And the answer alleged, on information and belief, that said remittances to it by the Packers' National Bank and the Schuster National Bank respectively were made in virtue of orders and directions previously given to them by said Capital National Bank on or about January 18, 1893, in the usual course of business between them and the Capital National Bank.

A replication was filed and evidence put in on behalf of the respective parties. It was stipulated that the Capital National

Bank continued to transact the usual and ordinary business of
a national bank up to the close of banking hours on January
21, 1893; that the ordinary mail time between Lincoln,
Nebraska, and the city of New York is fifty hours; be-
tween Lincoln and South Omaha, Nebraska, where the
Packers' National Bank is situated, is two hours and forty
minutes; between South Omaha and New York City,
forty-eight hours and thirty-seven minutes; between Lincoln
and St. Joseph, Missouri, where the Schuster Hax National
Bank is located, is seven hours and twenty-eight minutes, and
between St. Joseph and New York City is fifty hours and fifty-
five minutes. The complainant put in evidence an account
or statement, furnished by the defendant to the complainant,
showing the transactions between the Capital National Bank
and the Chemical National Bank from January 3, 1893, to
January 27, 1893, showing a balance on the last day of
$13,317.94, against the Capital National Bank and in favor
of the Chemical National Bank.

The complainant likewise put in evidence a draft drawn
on January 13, 1893, by the Capital National Bank on the
Chemical National Bank for $5000, to the order of T. M. Bar-
low, cashier; and a protest of said draft for non-payment on
January 17, 1893; also a statement of various drafts drawn
by the Capital National Bank on the Chemical National Bank,
at different times, in favor of third parties, and protested for
non-payment on and after January 24, 1893. These protested
drafts amounted to $44,264.66.

The defendant called as a witness its cashier, William I.
Quinlan, who testified that when the draft for $5000 to the
order of T. M. Barlow, cashier, was presented and payment
refused, the Capital National Bank had no deposits or funds
on deposit with the Chemical National Bank out of which
such draft could be paid, and that the account of the Capital
National Bank had been overdrawn for some time. The de-
fendant put in evidence a letter dated January 19, 1893, from
the Packers' National Bank, enclosing its draft for $5000 on
the Fourth National Bank of New York, to be placed to the
credit of the Capital National Bank, and letter, dated January

18, 1893, from the Schuster Hax National Bank, enclosing its draft for $2000 on the Chemical National Bank, to the credit of the account of the Capital National Bank.

Further evidence was put in by the respective parties, which it does not seem necessary to state.

On March 16, 1897, after argument, upon the pleadings and proofs, the Circuit Court dismissed the bill of complaint with costs. An appeal was taken from this decree to the Circuit Court of Appeals for the Second Circuit, and on January 31, 1898, that court affirmed the decree of the Circuit Court. And from the decree of the Circuit Court of Appeals an appeal was taken and allowed to this court.

*Mr. Edward Winslow Paige* for appellant.

*Mr. George H. Yeaman* for appellee. *Mr. George C. Kobbé* was on his brief.

Mr. Justice Shiras, after stating the case, delivered the opinion of the court.

The Capital National Bank of Lincoln, Nebraska, was organized as a banking association under the laws of the United States in June, 1884, and continued to transact the usual and ordinary business of a national bank up to the close of banking hours on January 21, 1893. On January 22, 1893, a bank examiner took possession, and thereafter, about February 6, 1893, a receiver was duly appointed.

The Chemical National Bank of New York, a banking association organized under the laws of the United States and doing business as such in the city of New York, carried on, for some years, a large business intercourse with the Capital National Bank.

The receiver filed the bill in this case, seeking to make the Chemical National Bank account for certain moneys received by it after the suspension of the Capital National Bank.

The nature of the intercourse between the two banks was thus described in a paragraph of the bill:

" Ever since the second day of June, 1884, there have been mutual and extensive dealings between the two banking associations above named, in which each was acting for the other, as correspondent banks do, for the making of collections and the crediting of the proceeds thereof and transmitting accounts of the same, including costs of protest and other expenses, and the Capital National Bank also kept an active deposit account with the defendant, and that settlements on the basis of such accounts were made at periodic times during all said period, and any balance, after the correction of errors, mutually agreed to be charged or credited, was at such periods credited or debited, as the fact might be, upon the books of each of said banks to a new account, and the prior accounts thereby and in that manner adjusted and settled."

The complainant's case depends, under the evidence, on an application of the provisions of section 5242 of the Revised Statutes, which is as follows:

" All transfers of the notes, bonds, bills of exchange or other evidences of debt, owing to any national banking association, or of deposits to its credit; all assignments of mortgages, sureties on real estate, or of judgments or decrees in its favor; all deposits of money, bullion or other valuable thing for its use or for the use of any of its shareholders or creditors; and all payments of money to either, made after the commission of an act of insolvency or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another, except in payment of its circulating notes, shall be utterly null and void; and no attachment, injunction or execution shall be issued against such association or its property before final judgment in any suit, action or proceeding in any State, county or municipal court."

It appears in evidence that on January 18, 1893, the account of the Capital National Bank with the defendant bank was overdrawn to the amount of $84,486.19, and that, by sundry remittances made, the amount overdrawn stood, on January 21, 1893, at the sum of $25,515.32. It further appears that on January 18, 1893, the Schuster Hax National Bank of St.

Joseph, Missouri, remitted by mail $2000 to the defendant for the credit of the Capital National Bank; on January 19 the Packer's National Bank of South Omaha, Nebraska, remitted by mail to the defendant $5000 for the credit and advice of the Capital National Bank; on January 20 the Capital National Bank remitted to the defendant by mail a package of small items amounting to $735 and a package amounting to $2935.60, and on the 21st a similar package amounting to $833.64. On January 23 the defendant received the remittance of $2000 of the 18th, and of $5000, $815.79 and $2935.60 of the 19th, and of the remittance of $735 of the 20th; and on the 24th of January it received the remittance of $833.64. With these remittances credited the account of the Capital National Bank stood, on January 24, 1893, overdrawn $13,317.94.

The claim of the complainant is to recover all the sums received by the defendant bank on January 23 and 24 as having been transferred and received contrary to the statute. The bill of complaint contains no allegation of any act of insolvency prior to January 22, 1893, or of any payment made in contemplation of insolvency, or of any payment made with a view to prevent the application of the bank's assets in the manner prescribed in the statute, or of any payment made with a view to the preference of one creditor to another.

It is true that, in the course of the trial, it appeared that, on the 17th day of January, 1893, the Chemical National Bank refused to pay a check for $5000 drawn on it by the Capital National Bank to the order of T. M. Barlow, and it is contended that such refusal by the Chemical National Bank is to be regarded as an act of insolvency on the part of the Capital National Bank. It is difficult to see any foundation for this contention in the mere fact that the Chemical National Bank refused, on January 17, to make further advances on the credit of the Capital National Bank. Such refusal may have been occasioned by a shortage of money on the part of the bank in New York, and because its funds on that day were needed for other purposes, and was entirely consistent with the absolute solvency of the Nebraska bank.

Nor can a finding that the payments and remittances made to the Chemical National Bank, on the dates above mentioned were made in contemplation of insolvency and with an intent to-prefer that bank, be based on the mere allegation that the Capital National Bank was actually insolvent, and that its insolvency must have been known to its officers. It is matter of common knowledge that banks and other corporations continue, in many instances, to do their regular and ordinary business for long periods, though in a condition of actual insolvency, as disclosed by subsequent events. It cannot surely be said that all payments made in the due course of business in such cases are to be deemed to be made in contemplation of insolvency, or with a view to prefer one creditor to another. There is often the hope that, if only the credit of the bank can be kept up by continuing its ordinary business, and by avoiding any act of insolvency, affairs may take a favorable turn, and thus suspension of payments and of business be avoided.

In the present instance there was not only no allegation of payments made in contemplation of insolvency, or with a view to prefer the Chemical National Bank, but there was no evidence that, up to the closing hours of January 21, 1893, the Capital National Bank had failed to pay any depositor on demand, or had not met at maturity all its obligations. And the evidence fails to disclose any intention or expectation on the part of its officers to presently suspend business. It rather shows that, up to the last, the operations of the bank and its transactions with the Chemical National Bank were conducted in the usual manner. It may be that those of its officers who knew its real condition must have dreaded an ultimate catastrophe, but there is nothing to justify the inference that the particular payments in question were made in contemplation of insolvency, or with a view to prefer the defendant bank. The Chemical National Bank was no more preferred by these remittances several days before suspension than were the depositors whose checks were paid an hour before the doors were closed. Indeed, it is stipulated that the Capital National Bank continued to transact its usual and ordinary business up to the close of banking hours on January 21, 1893.

The view of the courts below was that these payments and remittances were not made in contemplation of insolvency, or with a view to prefer the Chemical National Bank, and our examination of the evidence has led us to the same conclusion.

It remains to consider another proposition very strongly pressed on behalf of the appellant, and that is, that the moneys and checks remitted to the defendant bank which did not reach it till after the bank examiner had taken possession could not, in law, become the property of the defendant bank, but remained part of the assets of the insolvent bank, for which the defendant must account to the receiver, in order that the proceeds may be ratably divided among the creditors.

It is said that the taking possession of the bank by the Comptroller of the Currency is a distinct declaration of insolvency, and cases are cited in which it has been said by this court that the business of the bank must stop when insolvency is declared, *White* v. *Knox*, 111 U. S. 784; and that the state of case, where the claim sought to be offset is acquired after the act of insolvency, cannot sustain such a transfer, because the rights of the parties become fixed as of that time. *Scott* v. *Armstrong*, 146 U. S. 499.

The law is, doubtless, as thus stated, but does it apply to the present case?

It is conceded in his brief by the learned counsel of the appellant that if the drafts and checks had been deposited in the mail pursuant to any agreement, or even if the defendant had known any thing about them, they might have been regarded as the property of the Chemical National Bank as of the date of mailing. But he urges that this was only the case of a bank sending the checks of other parties to its agents for collection and deposit; that it could have sent them to any other agent had it pleased, and that after it had once put them in the mail it could have taken them out again. And queries are put as to which bank would have suffered the loss if the checks had been destroyed in transit, or if they had proved to be worthless.

But here we have the case, not of a casual remittance, but of remittances sent from time to time, and frequently, during a

long course of business between the banks concerned. There may have been no special agreement as to each particular remittance, but there was plainly a general agreement that remittances were to be made by mail, and that their proceeds were not to be returned to the Capital National Bank, but were to be credited to its constantly overdrawn account.

Whose the loss might be, if the packages were destroyed *in transitu,* or if the checks proved uncollectible, are not questions that concern us now. It is sufficient, for present purposes, to say that the inference is warranted that it was understood between the parties that these remittances were to be made through the mails, and that they were in the nature of payments on general account.

Nor can it be conceded that, except on some extraordinary occasion and on evidence satisfactory to the post office authorities, a letter once mailed can be withdrawn by the party who mailed it. When letters are placed in a post office they are within the legal custody of the officers of the government, and it is the duty of postmasters to deliver them to the persons to whom they are addressed. *United States* v. *Pond,* 2 Curtis C. C. 265; *Buell* v. *Chapin,* 99 Massachusetts, 594; *Morgan* v. *Richardson,* 13 Allen, 410; *Tayloe* v. *Merchants' Fire Ins. Co.,* 9 How. 390.

However, it is not pretended in this case that the checks were destroyed or proved worthless, or that the Capital National Bank either withdrew the remittances or countermanded their delivery.

We think that the courts below well held that, under the facts of this case, the mailing of these checks and remittances was a delivery to the Chemical National Bank, whose property therein was not destroyed or impaired by a subsequent act of bankruptcy.

It is finally urged that, however it may be as to the remittances received through the mail on January 23, 1893, yet that the payment or remittance of $833.64, received on January 24, was a payment made after the declaration of insolvency, and must therefore be accounted for by the defendant bank.

It is claimed that there was no evidence that this remittance came by mail, and that all there is in the case is the admission by the defendant bank of its receipt of that sum on January 24, 1893.

But it is to be observed that no mention is made in the bill of this particular item, though the other litigated items are specified, and to the latter only was the proof directed. In the absence of evidence as to any other method of transmission, and in view of the fact that all the other payments were made by mail, it would seem to be a reasonable inference that such was the case of this remittance. The record discloses that the cashier of the Chemical National Bank testified in the case. He had furnished the complainant with a statement of the accounts between the banks from January 3, 1893, to January 24, 1893, including this particular item; but he was not cross-examined as to this item. Had he been so examined, a more particular statement in respect to it would have been, no doubt, elicited. It was apparently assumed that the history of this payment did not differ from that of the others; and the effort now made in respect to it seems to be in the nature of an afterthought, too late to permit an explanation.

Upon the whole case, we are of the opinion that the decree of the Court of Appeals was correct, and its decree is accordingly

*Affirmed.*

Mr. Justice White, Mr. Justice Peckham and Mr. Justice McKenna dissented.