198

FEDERAL RESERVE BANK OF RICH-
MOND v. EARLY.

Circuit Court of Appeals, Fourth Circuit.
January 14, 1929.

No. 2750.

Maxwell G. Wallace, of Richmond, Va., for appellant.

R. E. Whiting, of Columbia, S. C., for appellee.

George P. Barse, of Washington, D. C., for Comptroller of the Currency (F. G. Awalt, of Washington, D. C., on the brief), amicus curiæ.

Before PARKER and NORTHCOTT, Circuit Judges, and WILLIAM C. COLEMAN, District Judge.

PARKER, Circuit Judge. This action was instituted in the court below by the receiver of the Farmers' & Merchants' Bank of Lake City, S. C., to recover of the Federal Reserve Bank of Richmond, Va., a reserve deposit balance of $22,088.48 alleged to be owing by the Reserve Bank to the Farmers' & Merchants' Bank at the time of the failure of the latter, and also to recover the sum of $4,115.15, being the surrender value, with accrued dividends, of 78 shares of stock in the Reserve Bank owned by the Farmers' & Merchants' Bank at the time of its failure. The Reserve Bank admitted the deposit balance and the liability on the stock, but pleaded the right to apply the deposit balance on checks drawn on the Farmers' & Merchants' Bank which it had received for collection and under its rules had forwarded to the latter bank for the purpose of effecting collection. As to the amount due on the stock, it pleaded the right to apply this as a set-off against the balance remaining due on the checks after applying the deposit balance. The facts were stipulated and a jury trial was duly waived. The trial judge held as a matter of law that the Reserve Bank was not entitled to apply the deposit balance, or set off the stock liability, as claimed, and gave judgment in favor of the receiver for the full amount demanded. The Reserve Bank has appealed.

The checks which the Reserve Bank claims the right to charge against the account of the failed bank, or upon which it seeks to apply the balance of that account, are checks which were sent to it for collection. It was handling them as collection agent under its clearance and collection system, which it had established under the authority to act as a clearing house for its member banks. See section 16 of Federal Reserve Act (12 USCA §§ 248(m), 360). This collection system, which was agreed to by the forwarding banks, as well as by the banks upon which the checks were drawn, was characterized, so far as the checks here are concerned, by the following provisions: (1) The Reserve Bank was acting only as agent of the forwarding banks, and assumed no liability, except for its own negligence; (2) it was authorized to send the checks direct to the drawee bank for collection; (3) the amount of any check for which payment "in actually and finally collected funds" was not received by the Reserve Bank was authorized to be charged back to the forwarding bank, regardless of whether or not the check itself could be returned; and (4) the checks, unless promptly returned by the drawee bank, were to be charged to its account with the Reserve Bank at the expiration of a designated transit time, in this case three days, but the latter bank reserved the right to so charge them at any time when in any particular case it was deemed neces-

sary to do so. This last provision, because of its importance to the questions here involved, we give in the exact language of the circular sent out by the Reserve Bank to its member banks, as follows:

"* * * The amount of any cash letter to a member bank is chargeable against available funds in the reserve account of such member at the expiration of such transit time, which date will be shown on each cash letter. The right is reserved, however, to charge a cash letter to the reserve account of a member bank at any time when in any particular case we deem it necessary to do so."

The balance of the insolvent bank which the Reserve Bank seeks to apply on the checks in controversy is a deposit balance in an account maintained in accordance with section 19 of the Federal Reserve Act (12 U. S.C.A §§ 461–464). It was subject to be checked against or withdrawn by the member bank for the purpose of meeting existing liabilities, but under the regulations and subject to the penalties prescribed by the Federal Reserve Board. 12 USCA § 464. These regulations, however, fixed the reserve requirements and prescribed penalties for deficiencies in the reserve. Regulation D, Series of 1924. The stock liability, against which the Reserve Bank seeks to set off the balance due on the checks in controversy, arises out of the ownership of 78 shares of its stock by the insolvent bank. The law provides that, upon the insolvency of a member bank, such stock shall be canceled and that cash paid thereon, with interest from date of last dividend, shall be first applied to all debts of the insolvent bank to the Reserve Bank, and the balance, if any, be paid to the receiver of the insolvent bank. 12 USCA § 288.

The case arose in the following manner: On October 7, 1926, the Reserve Bank forwarded for collection to the insolvent bank checks drawn against the latter amounting to $14,900.62. On October 8th it forwarded checks amounting to $20,170.71. The insolvent bank received the first lot of checks on October 8th, and the second on October 9th. It immediately acknowledged receipt of them in each case, and with the exception of a few small checks, which were dishonored and returned, it marked them paid and charged them on its books to the accounts of the various drawers. The bank closed its doors on October 9th, and a receiver was appointed for its affairs. At that time its reserve balance with the Reserve Bank was $22,088.48. The Reserve Bank did not attempt to charge any of the checks to the account of the failed bank until after notice had been received of its failure. On October 11th, however, it did charge the first lot of checks against it, and on the following day the second lot. The latter, however, were later credited to the account of the failed bank and charged against the customers of the Reserve Bank, from whom they had been received for collection, although the checks themselves were not, of course, returned. The Reserve Bank contends that the first lot of checks should be paid in full from the balance in the account of the insolvent bank, and that the balance remaining in its account should be applied pro rata on the second lot.

Upon these facts two questions arise: (1) Whether the deposit balance in favor of the insolvent bank should be applied on the checks in question, as contended by the Reserve Bank; and (2) whether the Reserve Bank can set off the balance due on the checks against its stock liability. We shall consider these separately, as they are governed by entirely different principles.

The first question, we think, should be answered in the affirmative. The checks were forwarded by the Reserve Bank to the insolvent bank under an agreement that they should be charged against its account at the expiration of three days, unless returned immediately. They were so sent because the owners, for whom the Reserve Bank was acting as agent, had consented to the arrangement. As a substitute for the right to have them presented through another bank and collected in cash, the owners had agreed that they be sent direct to the drawee, under the agreement that, if not promptly returned, they be charged against the drawee's reserve balance. When, therefore, they were accepted by the drawee, the owners had the right to demand that they be charged against the drawee's account, and that the balance in that account be applied by the Reserve Bank to their payment. The only question that can arise is: When does this right of the owners of the checks become fixed, so as to constitute it a charge upon the reserve balance? We think that it becomes so fixed when the drawee bank, either unequivocally accepts the checks, as in this case, or, by failing to return them promptly, becomes chargeable with them under the terms of the agreement. When the checks are accepted by the drawee, and charged to the accounts of the various drawers, the drawers and indorsers are released, and all rights arising out of the checks themselves are extinguished. See Federal Reserve Bank v. Malloy, 264 U. S. 160, 44 S. Ct. 296, 68 L. Ed. 617, 31 A. L. R. 1261; Cleve v. Craven Chemical Co. (C. C. A. 4)

18 F.(2d) 711, 52 A. L. R. 980. By accepting them, therefore, the drawee not only unequivocally manifests its acquiescence that they be charged to its reserve account, but it also releases the parties to whom the holders could look for payment in event of dishonor. The owners have consented that this be done only upon the agreement that the checks be charged to the reserve account of the drawee with the Reserve Bank. When it is done, and the drawers and indorsers are released, surely the right of the owners to have them so charged becomes fixed, without necessity for further action.

And this right, we think, depends, not upon the theory that the Reserve Bank is the owner of the checks, or that it has the right of set-off against the insolvent bank, but upon the fact that the contract of the parties has created an equitable charge upon the reserve account of the drawee bank, and that such agreement operates as an equitable assignment of so much thereof as may be necessary to pay the checks when they are unequivocally accepted by the drawee. Under familiar principles of equity, such an equitable charge upon a fund arises in favor of a party when he becomes entitled to have his claim paid from that fund. See 3 Pomeroy's Equity Jurisprudence (4th Ed.) §§ 1234, 1235 and 1280; Fourth Street Nat. Bank v. Yardley, 165 U. S. 634, 644, 17 S. Ct. 439, 41 L. Ed. 855; Hurley v. Atchison, Topeka & Santa Fé R. Co., 213 U. S. 126, 29 S. Ct. 466, 53 L. Ed. 729; Walker v. Brown, 165 U. S. 664, 17 S. Ct. 453, 41 L. Ed. 865; Ketchum v. St. Louis, 101 U. S. 306, 317, 25 L. Ed. 999; Parlin & Orendorff Implement Co. v. Moulden (C. C. A. 5th) 228 F. 111, L. R. A. 1917B, 130, certiorari denied 241 U. S. 669, 36 S. Ct. 553, 60 L. Ed. 1230; In re Hollins (C. C. A. 2d) 215 F. 41, L. R. A. 1915B, 438.

It is objected that the check is not to be charged to the account until the end of the transit time, which in this case is three days, and that in the meantime the account is subject to depletion by withdrawal, and it is argued that it cannot be said to be subject to a lien or charge for the payment of the checks until they are actually charged against it. But we think it is the right which accrues to the owners of the checks to have them charged to the reserve account of the drawee when the latter has unequivocally accepted them, and not the mere entry in the books of the bank, which is the determinative factor. It is true that the reserve account of the drawee bank is subject to withdrawals, and varies from time to time, and that, between the acceptance of the checks by the drawee and the charge entry by the Reserve Bank, the reserve account may have been depleted, as in this case, until it is less than the amount of the checks. This, however, cannot affect the right of the owners of the checks, which has already accrued, to have them charged against the reserve account, or to have the balance remaining in the account at the time of the charging applied, so far as it will go, toward their payment. The depletion of the account may affect the value of the right of the owners of the checks; we do not see how it can affect the existence of the right. It is analogous to the right of the holder of a check in those jurisdictions where the giving of a check is held to be an equitable assignment pro tanto of the funds on which it is drawn. In such case the withdrawal of the funds before the presentation of the check may defeat the right of the holder; but this does not impair the holder's right in the fund, if it is not in fact withdrawn before the insolvency of the drawer.

It is said that there can be no lien where the account is absolutely under the control of the drawee. But the account here was not under the control of the drawee. It was under the control of the Reserve Bank, which not only could have refused to honor checks and drafts drawn against it, but also had the right at any time to charge against it the cash letters outstanding. Of course, until the checks are charged against the account, the right of the owners is not that of a lien upon the exact deposit balance which exists when they are accepted by the drawee, but the right to a charge against the fluctuating balance, the amount of which is made certain either by the expiration of the three-day transit period, or by the earlier charging of the checks under the right reserved. "Id certum est quod certum reddi potest." Although in this case the transit period had not ended at the time of the closing of the drawee bank, the right of the owners of the checks to have them charged against the reserve balance of the drawee had become fixed and irrevocable, and the failure of the bank fixed the amount of the reserve balance applicable to their payment.

In that the rights of the parties depend upon the transactions which occurred prior to the insolvency and not upon the book entries made in carrying them out, the case is not unlike the case of McDonald, Receiver, v. Chemical National Bank, 174 U. S. 610, 19 S. Ct. 787, 43 L. Ed. 1106. In that case it appeared that it was the custom of the failed Capital National Bank to send to the

Chemical Bank checks and other cash items, which were credited to the account of the Capital Bank, which was frequently overdrawn. Shortly before a receiver was appointed for the Capital Bank, it mailed a number of checks and other cash items to the Chemical Bank, which were not received by the latter until after the receiver had taken charge, and consequently were not credited prior to insolvency. It was held that, notwithstanding this fact, the Chemical Bank was entitled to retain the items and credit same on the account of the Capital Bank. The decision was based upon the fact that under the course of dealing between the parties the right of the Chemical Bank to the checks and other items arose when they were deposited in the mails, just as here we think that under the agreement of the parties the right of the owners of the checks to have same charged against the reserve account of the drawee bank arose and became fixed when that bank accepted them.

The receiver argues that the right to charge the checks against the reserve account of the drawee is but the exercise of a power of attorney which is revoked by insolvency, and that the situation of the Reserve Bank, therefore, is that of a bank against which a check is drawn, and which has no authority to pay the check after the insolvency of the drawer. It is argued that the Reserve Bank is in the same situation as a collecting bank, which has accepted a check in payment of checks held for collection, where the drawer of the check fails before the check is collected. We do not think, however, that the cases are analogous. Under the federal rule and under the Uniform Negotiable Instruments Act, when a check is accepted in payment, it is not an assignment of funds, nor is it chargeable against particular funds. It is a mere order upon the drawee, which is revoked by the insolvency of the drawer.

Here, however, we have a contract which provides that, if the checks forwarded for collection are accepted by the drawer, his liability for them shall be chargeable against and paid out of a particularly designated fund, his reserve account with the Federal Reserve Bank. It is not a question of an order upon a third party, which such third party may honor or not, as he sees fit (National Bank of the Republic v. Millard, 10 Wall. 152, 19 L. Ed. 897); but of a binding agreement in which the holder of the fund is also the collecting agent. We think it falls clearly within the principle announced by Mr. Justice White in Fourth Street Nat. Bank v. Yardley, 165 U. S. 634, 644, 17 S. Ct. 439, 440 (41 L. Ed. 855), as follows:

"Whilst an equitable assignment or lien will not arise against a deposit account solely by reason of a check drawn against the same, yet the authorities establish that if in the transaction connected with the delivery of the check it was the understanding and agreement of the parties that an advance about to be made should be a charge on and be satisfied out of a specified fund, a court of equity will lend its aid to carry such agreement into effect as against the drawer of the check, mere volunteers, and parties charged with notice."

It is said that the case of Equitable Trust Co. v. First Nat. Bank of Trinidad, 48 S. Ct. 167, 72 L. Ed. 313, is authority against the position of the Reserve Bank, but we do not think so. In that case the Trinidad bank had drawn a draft on a bank in Italy, and had arranged with New York bankers to provide the drawee with funds, so that the draft could be honored, sending to the New York bankers funds for that purpose. The New York bankers had an account with the Italian bank, but no funds were designated out of which the draft of the Trinidad bank was to be paid. Upon the bankruptcy of the New York bankers, the Italian bank refused to pay the drafts which bankrupts had guaranteed, and their trustee in bankruptcy collected the balance to their credit in the Italian bank. The Bank of Trinidad claimed priority on this fund, on the ground that it was charged with a trust in its favor. Its claim was denied, for the reason that no fund was designated from which the draft was to be paid, and no fund was assigned for the purpose of taking care of it; the ground of the decision being thus succinctly stated by Mr. Justice Holmes: "What the parties meant to establish and what the respondent got was the assurance of a credit abroad to the extent of its check as in the case of a letter of credit, not an attenuated property right in an account to which no special funds were attached and the particulars of which neither the respondent nor the purchaser of the check could know."

In the case at bar, however, the checks were sent to the drawee upon the distinct and definite agreement that they were to be paid out of funds in the reserve account of the drawee by charging them to that account. In the case cited, the New York bankers failed before the draft of the Bank of Trinidad was presented. In the case at bar the checks were accepted by the failed bank, and the right to charge them against the reserve account of the drawee had become fixed before its failure. We see nothing in the Bank of Trinidad Case which would justify the

·holding that under such circumstances the checks were not a charge upon the reserve account of the drawee.

With respect to the deposit balance, therefore, our conclusion is that this is not recoverable by the receiver, but should be applied by the Reserve Bank upon the checks forwarded for collection. The same conclusion was reached in Federal Reserve Bank v. First National Bank (D. C.) 277 F. 300, and in Keyes, Receiver, v. Federal Reserve Bank, an unreported decision of Judge Page Morris of the District of Minnesota. And see, also, Storing v. First Nat. Bank (C. C. A. 8th) 28 F.(2d) 587, and Midland National Bank & Trust Co. v. First State Bank of Sioux Falls (Minn.) 222 N. W. 274, decided November 30, 1928.

On the second question, we do not think that the Reserve Bank has the right to set off the balance due by the insolvent bank on the checks against its stock liability. The Reserve Bank was not the owner of these checks. It was merely an agent for collection, and, although it credited them to the accounts of the forwarding banks, this was upon agreement that they might be charged back, if not collected, and the second lot of checks has been charged back. The stock liability is a liability created by statute, which provides that it "shall be first applied to all debts of the insolvent member bank to the Federal Reserve Bank, and the balance, if any, shall be paid to the receiver of the insolvent bank." 12 USCA 288. It is perfectly clear that the liability of the insolvent member bank for these checks is a liability owing to the owners of the checks, in which the Reserve Bank is not interested, except as collection agent, and is not "a debt of the insolvent member bank to the Federal Reserve Bank," within the meaning of the statute.

Even in the absence of a statutory direction as to how the liability should be applied, a set-off of checks held for collection against such a liability would not be allowed, for the reason that demands to be set off against each other must be mutual; that is, they must be due to and from the same parties and in the same capacity. 14 R. C. L. 656; 24 R. C. L. 858; Morse on Banks and Banking (6th Ed.) 334; Bank of the Metropolis v. New England Bank, 6 How. 212, 12 L. Ed. 409; Smith v. Bath L. & B. Ass'n, 126 Me. 59, 136 A. 284, 50 A. L. R. 526; Yardley v. Clothier (C. C. A.) 51 F. 506, 17 L. R. A. 462.

Our conclusion, therefore, is that the District Judge erred as a matter of law in finding for plaintiff with respect to the first cause of action, which relates to the deposit account, but that his finding with respect to the second cause of action, which relates to the stock liability, is correct. The judgment rendered will be set aside, therefore, and a new trial will be awarded on the first cause of action.

Reversed in part.