## ANDERSON v. FEDERAL RESERVE BANK OF BOSTON et al.
### No. 6832.

Circuit Court of Appeals, Fifth Circuit.
March 5, 1934.

320

Kenneth I. McKay, of Tampa, Fla., for appellant.

John D. Harris and Harvey L. McGlothlin, both of St. Petersburg, Fla., for appellees.

Before BRYAN, SIBLEY, and WALKER, Circuit Judges.

SIBLEY, Circuit Judge.

This is a contest between the receiver of a failed national bank and the holders of checks drawn on that bank which were presented by mail through a Federal Reserve Bank before the failure, and which the failed bank undertook to pay by sending by mail a draft against its reserve account in the Federal Reserve Bank. The receiver claims that he should have the amount of the reserve account undiminished by the draft. The checkholders claim that the amount of the draft is distributable to them as an accomplished collection. The Federal Reserve Bank, being doubtful as to its duty, sought and obtained an interpleader. The checkholders prevailed in the District Court, and the receiver appeals.

There is no conflict in the evidence, and the material facts are outlined as follows: The Federal Reserve Bank of Atlanta, herein referred to as the Reserve Bank, maintains at Jacksonville, Fla., a branch office to handle its business with member banks in that state. Checks aggregating $75,080 drawn on Central National Bank & Trust Company of St. Petersburg, Fla., herein called the St. Petersburg Bank, were sent for collection under Regulation J of the Federal Reserve Board to the Jacksonville branch of the Reserve Bank. The Jacksonville branch on April 15, 1931, sent them in "cash letters" to the St. Petersburg Bank, which received them on April 16th, honored them by charging them to the drawers, and canceled them, issuing its draft for the aggregate amount against its reserve account in the Reserve Bank payable to "yourselves" and mailed it to the Jacksonville branch. That afternoon the St. Petersburg Bank in its daily statement to the Reserve Bank showed its deposits lessened by the amount of the canceled checks and its reserve account lessened by the amount of the draft. The draft reached the Jacksonville branch at 8 a. m. Eastern Time on April 17th, and was in its hands on opening for business at 9 a. m. According to custom, the Reserve Bank at the end of business the previous day had advised the Jacksonville branch of the reserve balance of each Florida member bank, and that the reserve balance of the St. Petersburg Bank was $145,021. The Reserve Bank at Atlanta did not open until 10 a. m., Eastern Time, so that the balance would not be altered by the payment of drafts at Atlanta for an hour after the Jacksonville branch opened. The draft of St. Petersburg Bank was not dishonored by the Jacksonville branch, but was laid aside to be reported to Atlanta telegraphically as it was customary to do from time to time during the day, the books of the Reserve Bank being kept at Atlanta. At 10:05 a. m., Eastern Time, on April 17th the St. Petersburg Bank, theretofore apparently solvent, was declared insolvent and closed its doors, and notice thereof was received by the Reserve Bank at Atlanta at 10:52 a. m., Eastern Time, and at Jacksonville at 10:56. At that hour the draft of St. Petersburg Bank had not been reported to Atlanta, but at 11:08 a. m. it was reported by a telegram reading: "Debit checks for our cash letters: #5298 Central St. Petersburg $75,080.00" along with ten others from other banks. The draft was mailed to Atlanta that afternoon

and punched "Paid." The debit directed was entered at Atlanta, but the amount was put in a suspense account because of doubt as to what should be done and the checkholders were notified. The question is whether at the insolvency of the St. Petersburg Bank the Reserve Bank owed the $75,080 to the checkholders whose checks it had for collection or whether it still owed it to the St. Petersburg Bank as a part of its reserve.

█ It is urged that irrespective of the draft drawn by St. Petersburg Bank the Reserve Bank had the title to the checks which St. Petersburg Bank had accepted by canceling and taking credit for them, and the Reserve Bank could therefore offset the resulting obligation of the St. Petersburg Bank against the reserve account for the benefit of the checkholders. This contention cannot prevail because the Reserve Bank did not own the checks although unrestrictedly indorsed to it, but held them for collection only, and under Regulation J acted only as an agent. The obligation of the St. Petersburg Bank in respect of them was really owing to the several checkholders. There was no such mutuality of debts as would justify a set-off. Dakin, Receiver, v. Bayly, 290 U. S. 143, 54 S. Ct. 113, 78 L. Ed. ——; Dickens v. Howard, Receiver (C. C. A.) 67 F.(2d) 263.

█ The case must therefore be determined upon the effect of the draft. A question is made whether the draft against the reserve account did not operate in equity to assign it pro tanto under the doctrine asserted in Fourth Street Nat. Bank v. Yardley, 165 U. S. 634, 17 S. Ct. 439, 41 L. Ed. 855, and Early & Daniel Co. v. Pearson (C. C. A.) 36 F.(2d) 733. In the former case the claimed equitable assignment was supported by a present advance of full value, the benefit of which it was manifestly inequitable that the creditors of the failed bank should keep without giving effect to the intended assignment. In the latter case the same thing was true as to one of the assignments there sustained, and as to the others there was a special agreement for the handling of the drafts given against the failed bank's reserve account in virtue of which cash had been deposited in the failed bank. In the case at bar the St. Petersburg Bank got as the consideration of the draft it issued only the cancellation of checks against itself. The case of Early, Receiver, v. Federal Reserve Bank, 281 U. S. 84, 50 S. Ct. 235, 74 L. Ed. 718, was much like this except that there was no remittance draft and the Regulation J then of force provided that the Reserve Bank might charge against a member

bank's reserve checks sent to the latter for collection at any time when the Reserve Bank deemed it necessary to do so. That agreement is not now found in Regulation J. None of the three cited cases is controlling authority here, though they have some bearing. We do not hold this draft to be a pro tanto assignment operative from the moment of its issuance.

█ Nevertheless, we think that under the facts of the present case at the time the St. Petersburg Bank ascertained its insolvency and closed its doors the Reserve Bank had come to owe the amount of the draft to the checkholders and not to that bank. The St. Petersburg Bank on its part so regarded it, for it had the day before its failure made all proper book entries to express that change of relations and had sent the draft, which was an authority and a request to the Reserve Bank to do what was necessary on its part; and it had reported to the Reserve Bank that its reserve stood reduced and its deposits paid accordingly. No further action or consent or notice was necessary or expected on the part of the St. Petersburg Bank. As to the checkholders, they had invested the Reserve Bank with title to the checks and authority to credit each of them with the amounts of their several checks on a deferred schedule according to Regulation J, which deferred credits would on the close of business on April 17th have ripened by lapse of time without any further act or book entry. The only thing which needed to be done by any one was for the Reserve Bank to consent to the draft made by the St. Petersburg Bank on its reserve account and thereby consent finally to be bound by the deferred credits already entered in favor of the checkholders. Had the draft been actually charged to St. Petersburg Bank on the books of the Reserve Bank before notice of the failure, consent would have been clearly evidenced. But Regulation J, § V (7), as amended September 1, 1930, states: "No draft, authorization to charge, or other order upon any reserve balance, clearing account, deposit account, or other funds of a paying, remitting or collecting bank in the possession of a Federal Reserve Bank, issued for the purpose of settling items handled under the terms of this regulation will be paid, acted upon or honored after receipt by such Federal Reserve Bank of notice of suspension or closing of such paying, remitting or collecting bank." Regulation J is the authority of Reserve Banks to act as collectors of checks under Federal Reserve Act § 16, 12 USCA § 248 (m), and is binding on them. It is also

the agreement under which all banks dealing with a Reserve Bank in respect of such collections act, and it also binds them. The Reserve Bank here could accordingly not honor or act upon the St. Petersburg Bank's drafts after notice of the failure received at 10:52 a. m. That no book entry had previously been made charging the draft is not, however, conclusive that it had not been acted on and honored. Book entries are often delayed for hours and until the day's business is over. In Commercial Nat. Bank v. Armstrong, 148 U. S. at page 58, 13 S. Ct. 533, 535, 37 L. Ed. 363, it is said: "No mere bookkeeping between the Fidelity and its subagents could change the actual status of the parties, or destroy rights which arise out of the real facts of the transaction." In Federal Reserve Bank v. Early (C. C. A.) 30 F.(2d) 198, at page 200, it is ruled: "But we think it is the right which accrues to the owners of the checks to have them charged to the reserve account of the drawee when the latter has unequivocally accepted them, and not the mere entry in the books of the bank, which is the determinative factor." In affirming, 281 U. S. at page 90, 50 S. Ct. 235, 236, 74 L. Ed. 718, the Supreme Court on the same point declares: "There was no overt act necessary in addition to what the parties had agreed upon." In like vein the Supreme Court of Florida, in Bryan v. Coconut Grove Bank & Trust Co., 101 Fla. 947, 132 So. 481, 486, 134 So. 229, says: "That the check in question was not immediately charged against appellant's account does not of itself alter the nature of the transaction between the bank and appellant. * * * Whether or not the check was promptly entered on the bank's books is a matter of the bank's bookkeeping over which the appellant had no control. Neglect of the officers of the bank in this respect cannot prejudice the right of appellant." It is true that at the critical moment the Reserve Bank at Atlanta had not acted on and consented to the draft, for its agents there had no knowledge of it. But its agents at Jacksonville had, and we turn to the question of their authority to act.

The Jacksonville branch was in charge of a managing director. It had a place of business and a vault, and handled the business of the Reserve Bank with its Florida member banks, receiving deposits from them and shipping currency to them and collecting checks and drafts on or for them. The bookkeeping was all done in Atlanta, but at Jacksonville there were signature cards to determine the genuineness of signatures made for the Florida member banks, and each afternoon the Atlanta office gave it information of the reserve balance of each. This information was furnished the Jacksonville branch so that it could pay their drafts. From time to time during each day it telegraphed to the Atlanta office over a private wire the drafts which it had paid or otherwise honored. On April 17th, before notice of St. Petersburg Bank's failure, the Jacksonville branch had on order of St. Petersburg Bank paid $43,158.00 in cash to Barnett National Bank at Jacksonville, and the day before had shipped St. Petersburg Bank $55,000 in cash, all without obtaining any special authority from Atlanta. Although the director of the Jacksonville branch testifies that in his opinion it was intended that all transactions of the kind here involved should not be concluded in Jacksonville, but were to be finally determined and wound up in Atlanta, he testifies that drafts were habitually paid and he says that if it was decided that a remittance draft would not be paid, it was the duty of the Jacksonville branch to notify drawers and indorsers on each item of the cash letter covered by the draft, but that such drafts were in fact always paid when the reserve balance was sufficient to cover them. On these facts we think the Jacksonville branch was not a mere messenger to receive and deliver papers and money on the orders of the Atlanta office, but that it was a true branch office authorized to act on ordinary banking transactions with Florida member banks, with only a correctional supervision in Atlanta in case of error or mistake or fraud. It may be likened to a separate teller's window in the Atlanta office. What occurred in Jacksonville has the same significance and effect as if it had occurred in Atlanta.

The Jacksonville branch on opening on April 17th and on finding in its hands the St. Petersburg Bank's draft, did not ask instructions from Atlanta, nor intend to do so. It did not reject the draft and return it to St. Petersburg, but it retained it for the purpose of advising the Reserve Bank by wire of the resulting charge against the reserve account of the drawing bank, which being ample there was no reason in the usual course of business why the draft should not have been charged in Atlanta. When two hours later notice of the failure came to the Jacksonville branch, it did not treat the draft as unpaid and therefore unpayable under Regulation J, but a few minutes thereafter telegraphed the Atlanta office to debit it along with the drafts of other banks which had not failed, and it sent the draft itself to Atlanta in the usual course of business at the end of the day, and

the draft was there punched "Paid" as of April 17, 1931. The Jacksonville branch did not inquire whether it should consent to the draft, but having already consented it notified Atlanta and directed the debit to be made. Consent indeed might be presumed. Regulation J, § V (3), provided that the collecting Reserve Bank might receive remittance in such form as is acceptable to it. The Reserve Bank of Atlanta by its Circular 5, dated September 2, 1930, which put amended Regulation J into effect with its member banks, declared that remittances by draft for checks sent out for collection by the Jacksonville branch should be made by draft on Federal Reserve Bank of Atlanta or on some Jacksonville bank. But if a new consent to the specific draft be necessary, the facts of this case show that it was given when the draft was set aside in the Jacksonville office to be reported to Atlanta for debit. It became a closed transaction. See National Bank v. Burkhardt, 100 U. S. at page 689, 25 L. Ed. 766; American National Bank v. Miller, 229 U. S. 517, 33 S. Ct. 883, 57 L. Ed. 1310. By commercial usage and especially under the prearrangements between the Reserve Bank and its members, no notice of consent to the draft was to be given to St. Petersburg Bank. The case stands as though the draft had come to Atlanta and had there been laid aside for entry on the books. Instantly on consenting to the draft, if not on its bare receipt, the Reserve Bank became discharged pro tanto from its indebtedness to St. Petersburg Bank, and became finally liable to the checkholders for the deferred credits already conditionally entered in their favor. There was a novation of the obligations. The checkholders and not the receiver of the St. Petersburg Bank are the creditors of the Reserve Bank for the sum represented by the draft.

Judgment affirmed.