KELLEY, Receiver, Appellant, vs. PAUL CLOTHING & SHOE COMPANY, Respondent.

*November 11, 1936—March 9, 1937.*

A. T. *Pray* of Ashland, for the appellant.

R. C. *Trembath* of Hurley, for the respondent.

The following opinion was filed January 12, 1937:

NELSON, J. Plaintiff is the receiver of the Hurley National Bank, hereafter called the "bank," in charge of its liquidation under the comptroller of the currency. Defendant is a mercantile corporation in business at Hurley. On

June 18, 1932, defendant had on deposit in the bank the sum of $7,900. June 18th was a Saturday, and in accordance with its usual custom, the bank closed at noon. During the morning of that day the defendant withdrew by check the sum of $6,000 in cash and deposited it in the Iron Exchange Bank at Hurley. Up to noon on Saturday the bank was open for normal business. There were heavy withdrawals during the forenoon, but apparently there was nothing that could properly be called a run on the bank. During the morning it paid all checks presented to it and accepted deposits. There was nothing to indicate to outsiders that anything unusual was pending. Within an hour or two after the closing of the bank for the day, the board of directors by resolution turned the bank over to the comptroller of the currency. On June 18, 1932, the bank was insolvent to the knowledge of all of the officers and directors. On February 26th of that year an examination of the bank had disclosed that the depreciation in the bank's bond account exceeded by $18,120.68 the bank's entire capital, surplus, profits, and reserves. From that date on the condition of the bank had grown steadily worse. On June 14, 1932, the cashier, at the direction of the board of directors, had advised the chief examiner as to the serious condition and asked the immediate presence of an examiner. On June 16th the directors met with a deputy bank examiner and discussed the possibility of relief through a consolidation with the Iron Exchange Bank. A committee was appointed to confer with officers of the Iron Exchange Bank with a view to accomplishing a merger. Under the terms of the proposed merger, the Iron Exchange Bank was to assume no liabilities but was only to liquidate the bank. The matter was submitted to the president and several of the directors of the Iron Exchange Bank on the same day, and one of the officials of that bank left Hurley that night to consult with Milwaukee stockholders. Early in the morning of the 18th, information was communicated to the officers of the bank that the merger

plan could not go through. After considering the advisability of closing at once, it was finally decided to keep the bank open until noon.

Mr. Kyle, a stockholder of defendant, testified that the only purpose of the withdrawal was to get the money out of the bank and into the Iron Exchange Bank because "we wanted the money available to conduct our business." Mr. Downs, an officer of the defendant and the person who presented the check, said, "It was understood between Mr. Kyle and me that I withdraw the money from the bank so that it wouldn't be tied up in case a merger or anything like that came up." The withdrawal came after an intimation from Mr. Kyle to Mr. Downs that there was talk of a merger of the banks, and that it might be possible that defendant's funds would be tied up for some time. Mr. Kyle was a director of the Iron Exchange Bank. He was not present at the meeting of June 16th at which the merger proposition was discussed, but on June 17th, the vice-president of the Iron Exchange Bank called Mr. Kyle to his office and disclosed that a merger of the two banks had been suggested. Kyle knew that a representative of the Iron Exchange Bank had gone to Milwaukee to consult certain of its Milwaukee stockholders.

So far as the evidence discloses, the information communicated to Mr. Kyle was that the vice-president of the bank had suggested that it was getting hard for two banks to do business in the city of Hurley, and he wondered if they could merge. He claims that no details of the proposition were explained to him, and that he had no knowledge as to the terms of the proposed merger.

The applicable federal statute is sec. 5242, R. S. U. S. (12 USCA, § 91) which is as follows:

"*Transfers by bank and other acts in contemplation of insolvency.* All transfers of the notes, bonds, bills of exchange, or other evidences of debt owing to any national banking association, or of deposits to its credit; all assignments of

mortgages, sureties on real estate, or of judgments or decrees in its favor; all deposits of money, bullion, or other valuable thing for its use, or for the use of any of its shareholders or creditors; and all payments of money to either, made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another, except in payment of its circulating notes, shall be utterly null and void; and no attachment, injunction or execution shall be issued against such association or its property before final judgment in any suit, action, or proceeding, in any state, county, or municipal court."

Under the specific terms of that statute it seems clear that a payment made by a bank to a creditor of a bank is not null and void as a preferential payment unless it is made after the commission of an act of insolvency or in contemplation thereof, and with a view to prevent the application of its assets in the manner prescribed by law, or with a view to the preference of one creditor to another. It was so held in *National Security Bank v. Butler,* 129 U. S. 223, 9 Sup. Ct. 281, 284, 32 L. Ed. 682. The court said:

"It is sufficient, under section 5242 of the Revised Statutes, to invalidate such a transfer, that it is made in contemplation of insolvency, and either with a view to prevent the application of the assets of the bank in the manner prescribed by chapter 4 of title 62 of the Revised Statutes, or with a view to the preference of one creditor to another. Certainly, the transfer in question was made in contemplation of insolvency, made as it was after the directors had voted that the bank should go into liquidation, and should be closed to business, and that a receiver should be appointed; and it was made with a view, on the part of the Pacific Bank and of its cashier, who represented it and acted for it in this transfer of its assets, to prevent the application of its assets in the manner prescribed by such chapter 4 of title 62, and with a view to prefer the Security Bank to other creditors. The transaction, if allowed to stand, could result in nothing else. The

statute made it void, although there was no such view on the part of the Security Bank in receiving the transfer of the assets; and although there was no knowledge or suspicion at that time on the part of the Security Bank that the Pacific Bank was insolvent or contemplated insolvency, or was not doing business, or that its directors had voted to close it, or that application was to be made for a receiver; and although the transfer took place before the application was actually made to the comptroller for the appointment of a receiver."

A bank may be actually insolvent at the time a payment is made, but that fact does not make the payment null and void and therefore recoverable as a preferential payment. It was so held in *McDonald v. Chemical Nat. Bank*, 174 U. S. 610, 19 Sup. Ct. 787, 790, 43 L. Ed. 1106. The court said:

"Nor can a finding that the payments and remittances made to the Chemical National Bank, on the dates above mentioned were made in contemplation of insolvency and with an intent to prefer that bank, be based on the mere allegation that the Capital National Bank was actually insolvent, and that its insolvency must have been known to its officers. It is matter of common knowledge that banks and other corporations continue, in many instances, to do their regular and ordinary business for long periods, though in a condition of actual insolvency, as disclosed by subsequent events. It cannot surely be said that all payments made in the due course of business in such cases are to be deemed to be made in contemplation of insolvency, or with a view to prefer one creditor to another. There is often the hope that, if only the credit of the bank can be kept up by continuing its ordinary business, and by avoiding any act of insolvency, affairs may take a favorable turn, and thus suspension of payments and of business be avoided."

"The Chemical National Bank was no more preferred by these remittances several days before suspension than were the depositors whose checks were paid an hour before the doors were closed. Indeed, it is stipulated that the Capital National Bank continued to transact its usual and ordinary business up to the close of banking hours on January 21, 1893."

Decisions rendered by the federal courts in similar controversies subsequent to the *McDonald Case, supra,* state the applicable rule thus:

"If the financial condition of a bank is such that an actual act of insolvency is imminent, and the officers of the bank know or ought to know this condition, a payment to a creditor or depositor is void if not made *in the ordinary course of business;* an intent to prefer is presumed under such conditions, and as a rule the creditor and depositor need not know of the imminency of the act of insolvency." *Nelson v. Lewis* (C. C. A.), 73 Fed. (2d) 521. See also *Rucker v. Kokrda* (C. C. A.), 68 Fed. (2d) 73; *Avcock v. Bradbury* (C. C. A.), 77 Fed. (2d) 14; *Kullman & Co. v. Woolley* (C. C. A.), 83 Fed. (2d) 129; *Roberts v. Hill* (C. C.), 24 Fed. 571.

The rule of those cases now appears to have the approval of the supreme court of the United States. In the very recent case of *Mechanics Universal Joint Co. v. Culhane*, 57 Sup. Ct. 81, 84, the court, speaking through Mr. Justice BRANDEIS, said:

"It is true that ordinarily a payment made by a bank to a depositor in the usual course of business is not recoverable, even though the bank was then clearly insolvent."

Under these decisions, the controlling question would seem to be whether the defendant's check for $6,000, which was presented to the bank on the morning of June 18, 1932, was paid by the bank in the "usual course of business." While it appears that during the forenoon of that day the deposits were segregated (probably upon the advice of the deputy examiner or as a precautionary measure) all checks presented to the bank for payment by its customers were promptly paid without question and in what must be held to be in the usual course of business. The rule enunciated by the federal courts, *supra,* however, is not broad enough to include a payment made to an officer of the bank who has knowledge that

insolvency of the bank is in contemplation, or to a corporation of which he (an officer of the bank) is an officer, even though made in what otherwise might appear to be the usual course of business. In the *Mechanics Universal Joint Co. Case, supra,* the defendant had a balance in the Manufacturers Bank on Friday, June 12, 1931, amounting to $65,224.30. On that day a check for $24,761.12 was drawn payable to another bank in the same city and was sent there for deposit to defendant's account. During that day the Manufacturers Bank conducted its business as usual, accepted deposits, honored checks and met all demands. Up to that time it had not committed an act of insolvency. It was, however, insolvent and known by its officers to be so. It closed its doors on the following day. The check in question was drawn by the president of the defendant company who was then and for two years prior thereto had been a director of the Manufacturers Bank and fully knew its precarious condition. It was held that the payment was not made in the usual course of business and constituted a preference. The court said :

"One of the objects of the national bank system is to secure, in the event of insolvency, a just and equal distribution of the assets of national banks among unsecured creditors, and to prevent such banks from creating preferences in contemplation of their failure. Compare *National Bank v. Colby,* 21 Wall. 609, 613, 614; *Davis v. Elmira Savings Bank,* 161 U. S. 275, 284, 290. To that end R. S. § 5242, 12 U. S. C. § 91, prohibits preferential payments. That prohibition is not directed solely to managing officers. The duty not so to defeat the just and equal distribution of the assets commanded by the act rests upon all who obtain such knowledge by reason of their connection with the bank— upon directors and employees as well as upon the executive officers. By R. S. § 5147, 12 U. S. C. § 73, each director is required to take an oath that he 'will not knowingly violate or willingly permit to be violated any of the provisions of this title.' *Finn v. Brown,* 142 U. S. 56, 68. Ekstrom violated his oath and the duty under R. S. § 5242, which it im-

posed, when he used knowledge of the bank's perilous condition, gained in his position of trust, to cause the withdrawal of funds by his company, with a view to assuring it a preference over other depositors who lacked that knowledge.

"We have no occasion to decide whether a stranger would be liable as for a preference, if, without suggestion from any officer or employee of the bank, he withdrew his deposit because of rumor or suspicion of insolvency. It is true that ordinarily a payment made by a bank to a depositor in the usual course of business is not recoverable, even though the bank was then clearly insolvent. Compare *McDonald v. Chemical National Bank,* 174 U. S. 610. But the payment here in question was not made in the usual course of business; and the company was not a stranger. Its president and manager was a director of the bank; as such acquired in confidence knowledge of its perilous condition; and, in violation of his statutory duty as director, used that knowledge for the purpose of preferring his company. If the deposit withdrawn had been in Ekstrom's own name, he would, obviously, have been obliged to return it. The company is in no better position. Compare *McCaskill Co. v. United States,* 216 U. S. 504; *Curtis, Collins & Holbrook Co. v. United States,* 262 U. S. 215. As it is liable under the statute, we have no occasion to decide whether it would be liable also on general principles of law or equity. Compare *Yates v. Jones National Bank,* 206 U. S. 158, 178; *Bowerman v. Hamner,* 250 U. S. 504, 510."

From this case, it is clear that payment of a check by a bank, before its doors are closed, constitutes a preference if the withdrawal was prompted by knowledge acquired as a result of some official connection with the bank or by knowledge communicated to a depositor by an officer, director, or employee of a bank contemplating insolvency. A payment or withdrawal made under such circumstances is held not to be one made in the usual course of business. The supreme court left open the question whether a stranger who withdrew his deposit because of rumor or suspicion of insolvency without suggestion from an officer or employee of the bank would be

liable as for a preference, clearly intimating, however, that there would be no such liability.

In this case, Kyle was not a director of the bank but was a director of the Iron Exchange Bank. The court specifically found that while the officers of the defendant must have had a suspicion that the affairs of the bank were not in good financial condition, it was unable to find from the evidence that they knew the bank would soon have to close for liquidation. That finding must be accepted as a verity in this case, since it is clearly supported by the evidence. It must also be taken as a verity that no information concerning the actual condition of the bank was communicated to Kyle either by officers of the bank or by the officers of the Iron Exchange Bank. It is clear that enough information came to Kyle as a director of the Iron Exchange Bank to give rise to a suspicion that the affairs of the bank were not financially satisfactory. In *Rucker v. Kokrda, supra,* the supreme court addressed itself to a question somewhat similar to this when it said:

"There is no proof . . . that he had any inside information as to the bank's condition. . . . Rucker undoubtedly shared the nervousness of the community about the bank, and withdrew his funds on that account, but that is all."

The trial court further found that the cashier of the bank knew that the withdrawal of $6,000 in currency on that day would probably nearly exhaust the cash then on hand, but there was no specific design on the part of the cashier or other officers of the bank to prefer the defendant's claim over other creditors. That finding must likewise be treated as a verity, since there is evidence to support it. It is not suggested by plaintiff's counsel that the cashier or any officer or employee of the bank induced or prompted the defendant to withdraw the $6,000 "with a view to prefer it to other creditors of the bank or with a view to prevent the application of its assets in the manner prescribed by law." While

the officers of the defendant knew of the proposal of the bank to consolidate with the Iron Exchange Bank, that proposal did not necessarily spell insolvency. It is our conclusion that since the findings of the trial court are not against the great weight and clear preponderance of the evidence, its findings should not be disturbed.

*By the Court.*—Judgment affirmed.

WICKHEM, J. (*dissenting*). In *Mechanics Universal Joint Co. v. Culhane, supra,* the court left open the question "whether a stranger would be liable as for a preference, if, without suggestion from any officer or employee of the bank, he withdrew his deposit because of rumor or suspicion of insolvency." Perhaps the inference is that such a withdrawal is not a preference, if in all other respects it is made in the usual course of business. My difficulty with the instant case is that the information upon which defendant's suspicion was founded was communicated to one of its officers in his official capacity as director of the Iron Exchange Bank, it having theretofore been communicated to the officers of that bank by officers of the Hurley National Bank. So far as the source of the information is concerned, it seems to me that it falls in the case of "inside" information, and that the doctrine of the *Mechanics Case* would cover it and declare the subsequent withdrawal preferential. The only question is whether the fact that defendant's officers did not have precise information as to the exact condition of the Hurley National but acted upon a suspicion of its financial embarrassment is enough to save the withdrawal. In my opinion it is not. This suspicion was not grounded upon that type of vague community rumor evidently referred to in the *Mechanics Case* and with which everybody who has lived through these last difficult years is familiar. It was engendered by a proposal of merger officially communicated to a bank of which one of defendant's officers was a director. While information that a merger is contemplated may not

mean necessarily that the bank which proposes it is financially embarrassed, this was a reasonable inference during the recent crisis, and it was the inference that officers of defendant drew and acted upon. It seems to me that this is enough to compel the conclusion that the withdrawal was out of the usual course of business and preferential in character.

I am authorized to state that Mr. Justice FOWLER concurs in this opinion.

A motion for a rehearing was denied, with $25 costs, on March 9, 1937.