## McGREGOR, receiver, *v.* BATTLE.

1. When money is placed in a bank on general deposit, the title to the money immediately passes to the bank, and the relation of debtor and creditor is created between the bank and the depositor. The moment the deposit is made, the credit of the banker is substituted for the money.

2. If a bank, though insolvent, is still conducting its business and pays a check of a depositor in the usual course of business, and the depositor has no notice of the insolvency of the bank, the payment is good and the depositor will be protected. If, however, the depositor is paid, not in the usual course of business, but at a time when he has notice or knowledge that the bank is insolvent, and that the intent of the bank is to create a preference in his favor over other creditors, the payment is not good, and such depositor is liable to repay to the bank, or its representative, such an amount as would be the difference between the amount received by him and his pro rata share of the assets of the bank upon a final winding up of its affairs.

3. There was no evidence authorizing the judge to charge the jury on the law of special deposits; and the instruction on this subject was, under the facts of the case, an error of such a grave nature as to require a reversal of the judgment.

Argued April 18,—Decided July 10, 1907.

Equitable petition. Before Judge Rawlings. Warren superior court. September 1, 1905.

McGregor, as receiver of the Bank of Warrenton, brought suit against Battle, alleging that on February 17, 1902, and prior thereto, and especially on February 14, the bank was insolvent or in contemplation of insolvency; and while so insolvent, the bank, in collusion with the defendant, delivered to him, and he took therefrom, the sum of seven thousand dollars in cash, which amount

was received by him under the following circumstances: On February 11, he became a stockholder in the bank, having purchased seventy shares of its capital stock of the par value of one hundred dollars, and certificates of stock were duly issued and delivered to him. On February 13, in collusion with Allen, who was his brother-in-law and president of the bank, defendant delivered to Allen the seventy shares of stock, and Allen directed the cashier to pay to defendant seven thousand dollars of the cash of the bank, or to place the same to the credit of the defendant as a depositor; and on February 14, the defendant, with a full knowledge of the insolvency of the bank, drew said seven thousand dollars in cash therefrom. The purpose of Allen was to give the defendant a preference over the other creditors of the bank; the liabilities of the bank being, at that time, sixty thousand dollars, while its assets did not exceed ten thousand dollars. At that time the bank was absolutely insolvent and known to be so by the defendant. Some of the depositors made inquiries with a view to withdrawing their deposits, when the defendant, in collusion with Allen, made a public display of the seven thousand dollars, for the purpose of deceiving them, and they, being so deceived, allowed their deposits to remain in the bank. The assets in the hands of the plaintiff, as receiver, are not sufficient to satisfy all of the liabilities of the bank, and it is therefore necessary to recover from the defendant the amount he fraudulently received. It is charged that the payment to Battle by the bank was for the purpose of giving Battle a preference over the other creditors of the bank, and was done with the intent to delay, hinder, and defraud such other creditors; and that this intent was known to Battle. The prayer was that Battle be required to receive the certificates of stock, and that plaintiff have a judgment for the sum of seven thousand dollars, with interest from February 14, 1902.

The defendant filed an answer alleging as follows: He was never a stockholder in the bank; he had no knowledge whatever, until within a few days before its failure, that it was insolvent or in an embarrassed condition; a week or ten days before the failure, at the solicitation of the cashier, who assured him that the bank was solvent and its stock was a good investment, he agreed to make some investigation as to the bank's affairs with a view to taking stock therein, and, making a casual investigation, he

ascertained that three named parties owed the bank large sums, but there was other large indebtedness to the bank that he did not know of. In ignorance of the indebtedness, other than that of the three persons above referred to, he agreed to take fifteen thousand dollars of stock in the event that one of such persons paid his entire indebtedness and the others reduced theirs to a safe amount. These negotiations began about February 1; and on February 10, he agreed to take the stock on the conditions referred to. He made arrangements by which he obtained the money, and, on February 12, deposited in the bank seven thousand dollars which he expected to use to pay for the stock. On February 14, he happened to be in the bank, when the cashier, who had been very officious in endeavoring to induce him to take the stock, without any request from him, handed him through the window a paper, which, to his surprise, he discovered was a certificate for seven thousand dollars of stock. He then stated to the cashier that he was not to take any of the stock except upon certain conditions, and asked the cashier where was Mr. Allen, the president. On being informed that Mr. Allen was in his office in the rear of the bank, he immediately took the certificate to Allen and asked him if the conditions on which he was to take the stock had been complied with; and on being informed that they had not, defendant at once told Allen that he could not take the stock until these conditions had been complied with, and left the certificate of stock with Allen. It was immediately after this that the defendant drew out his money which was on deposit in the bank. It was not placed there in payment for stock, and was not passed to the stock account with the defendant's knowledge and consent. Allen agreed to release the defendant from his contract for the stock, and in pursuance of this agreement paid him the money which he had deposited.

The trial resulted in a verdict for the defendant; and the plaintiff made a motion for a new trial, which being overruled, he excepted.

*Samuel H. Sibley, L. D. McGregor,* and *A. L. Miller,* for plaintiff. *E. P. Davis,* for defendant.

COBB, P. J. (After stating the facts.)

1. The liability of the defendant to the plaintiff depends upon the character of the deposit made by him when the seven thousand

dollars were turned over to the bank. If it was a special deposit for a particular purpose, that is, to be kept by the bank intact to be used to pay for the stock if the conditions upon which he was to purchase were complied with, he would not be liable to the plaintiff for withdrawing the deposit at the time that he did. If the money was deposited with the bank for safekeeping only, there to remain intact until called for, the defendant would have the right to call for the same at any time, and have delivered to him the parcel containing his money, without reference to the financial condition of the bank at the time that the demand for the special deposit was made upon it. In either event no title to the money passed to the bank. Zane on Banks & Banking, §162 et seq. If the money was placed in the bank on general deposit, the moment the deposit became complete title to the money passed to the bank, and the relation of debtor and creditor was created between the parties. "The moment the deposit was made, the credit of the banker was substituted for the money." *Ricks* v. *Broyles,* 78 *Ga.* 614; *Schofield Man. Co.* v. *Cochran,* 119 *Ga.* 901. The defendant admits in his answer and in his evidence that he deposited the money in the bank. The question, therefore, is whether it was a general deposit or a special deposit. The money was turned over to the officers of the bank. There was no request that the deposit should be kept separate from the other funds of the bank. It was entered upon the books as a general deposit. A certificate of deposit was issued to the defendant, which, so far as the evidence discloses, had none of the indicia of a special deposit. When the defendant sought to withdraw his money, he signed a check upon the bank; the usual manner in which general deposits are withdrawn. The transaction had all of the characteristics of a general deposit, and was entirely lacking in any of the essential elements of a special deposit. It is true that on the day following the making of the deposit, when the check drawn by the defendant was paid, he received, in payment of his check, a part of the identical money that he had deposited the day before; but he received other money from the bank also; the amount of money put in by him not being, on that day, sufficient to discharge his check in full. What he received on the day following his deposit was the money of the bank. It was true that it was his money at one time on the preceding day, but, as a legal consequence resulting from the de-

posit in the manner in which it was made, title to the money
vested in the bank; and when he drew his check as a general
depositor, while he received back some of the very money which
he had himself deposited, he did not receive it as his own money
but as the money of the bank. Some of this money, although the
identical money that he had deposited on the day before, was as
much the property of the bank as the remainder of the amount paid
to him which came from other funds of the bank. There are
respectable authorities holding that if a bank receives a general
deposit at a time when it is insolvent, and its insolvency is known
to the officers of the bank but unknown to the depositor, the de-
positor may reclaim his deposit; no title to the money passing on
account of the fraud perpetrated upon him. In some cases this
doctrine seems to have been recognized in the general terms above
stated. In others it has been limited to those cases where the
money of the depositor could be identified and separated from the
general funds of the bank. In other cases it has been held that
the doctrine does not apply if the money of the depositor has be-
come mingled with the general funds of the bank. 5 Cyc. 565;
2 Morse on Banks (4th ed.), §629; Boone on Banks, §295; Magee
on Banks, §333; Zane on Banks, §344; 3 Am. & Eng. Enc. Law
(2d ed.), 847. The code declares that if any insolvent bank or
banker, with knowledge of such insolvency, shall receive money on
general deposit, and fail to pay the depositor within three days
after demand, such banker or officer in charge of the bank re-
ceiving the deposit shall be guilty of a felony. Civil Code, §1982;
Penal Code, §207. The primary purpose of this provision is to
punish the officers of a bank who receive on deposit money of
others, knowing that the bank is in a condition where it can not
repay the same. It is contended that this is a recognition, by the
General Assembly, of the fact that the receiving of the deposit in
such circumstances is a fraud on the depositor who is ignorant
of the condition of the bank, and therefore is in effect a recog-
nition of the principle above alluded to, which authorizes a depos-
itor to reclaim his deposit. It is to be noted, however, that the
banker or officer of an incorporated bank may prevent a prosecu-
tion by repayment of the deposit within three days after demand.
In the case of a private banker he may repay the same from any
assets owned by him independently of those embarked in his bank-

ing business, or assets thus embarked, so long as he is in a position where he can legally control the disbursement of such assets. But in the case of an officer of an incorporated bank, in order to prevent a prosecution he must refund to the depositor the amount of his deposit out of his own assets; for the penalty of the law is placed upon him as an individual, and he has no authority, by virtue of his office in the bank, to use the assets of the bank for the purpose, unless it is done by the authority of those in control of the bank, and under the circumstances it is lawful for the bank to make such a disposition of its assets. The code also declares that all conveyances, assignments, transfers of stock, or other contracts made by the bank in contemplation of insolvency, or after insolvency, except for the benefit of all creditors and stockholders, shall be fraudulent and void, unless made to an innocent purchaser for value, without notice or knowledge of the condition of the bank, and the officers making or consenting to such conveyance or contract shall be punished as for a felony. Civil Code, § 1979; Penal Code, § 208. The purpose of this provision is to prevent the bank from preferring one of its creditors when the fact of insolvency is known to the creditor. A depositor by general deposit is a mere creditor, and if the bank makes to the depositor a conveyance, or assignment, or transfer of stock, or other contract the legal effect of which is to give to such depositor a preference over the other creditors, the transaction is void, and the officer conducting the same a felon. It is a well-settled principle that if one obtains the goods of another under a contract of sale as the result of a fraudulent misrepresentation as to his solvency, the seller, upon discovering the fraud, may rescind the sale and reclaim the goods in the event that they are still in the possession of the buyer and the rights of innocent parties are not affected by such reclamation. It may be, therefore, that where, by the fraudulent representation of the officer of a bank as to its solvency, one is induced to make a general deposit of his money, the depositor may, after the discovery of the fraud that has been perpetrated upon him, recover the money that he has deposited, provided the same can be identified and the actual money received by the bank returned to him; but where one intending to become a depositor in a bank makes no inquiry as to its solvency, and is not induced to make the deposit as the result of any statement made

by the officers of the bank, such depositor is in no better position than any other person who deals with an insolvent under the impression that he is solvent. One who sells goods to an insolvent, such sale not being brought about by any fraudulent misrepresentation, can not, after the goods' have been delivered, reclaim the same upon the ground that he has since discovered that his buyer is insolvent, even though the fact of insolvency were well known to every other person than the seller himself. Upon the same principle we think that where one deals with a bank upon the assumption that it is solvent, and intrusts his money to it as a general depositor, he has no superior claim over other creditors growing out of the fact that he was ignorant of the insolvency at the time of the deposit; there being no fact amounting to an inducement to make the deposit other than the bank holding itself out to the world as a bank of deposit. We do not think that .the mere silence of the officers of a bank as to its condition at the time of the deposit is sufficient either to authorize a depositor to reclaim his money on account of a fraud, or to give him any superior lien over other creditors in the distribution of the assets of the bank. As stated above, however, we are aware that there are respectable authorities which go to this extent.

2. If a bank is insolvent but is still conducting its business, and pays the check of a depositor in the usual course of business, and the depositor has no notice of the insolvency, the payment is good, and the depositor is protected notwithstanding the bank is actually insolvent. In *Hill* v. *W. & A. R. Co.*, 86 Ga. 284, it was held that a depositor who draws his check on a bank and receives effects therefrom, without notice of, or reason to suspect, its insolvency, will be treated as a bona fide purchaser under the act above referred to. See also Dutcher *v.* Importers Bank, 59 N. Y. 5. There is no ruling in the case in the 86 *Ga.* as to what would be the effect upon the transaction if the depositor knew of the insolvency, or had reason to suspect it, at the time that he received payment of his check, when such payment was made while the bank was still in operation and the payment made in the usual course of business. It is a well-known fact that the suspicion that a bank is insolvent causes all depositors who are acquainted with the facts leading to the suspicion to rush at once and withdraw their deposits. A run on a bank is always produced by

those who think they have reason to suspect that the bank is in a failing condition. And we are not prepared to hold, if a bank is still in operation, open during the usual hours of business, paying its checks in the order in which they are presented, according to the custom of bankers, that a depositor who merely had reason to suspect the solvency of the bank, this being the motive for his drawing a check, would be required to repay to the bank the amount so withdrawn, less what would be his pro rata share in the assets of the bank on the day that the amount was withdrawn, in the event that the bank was afterwards forced to liquidation and was in fact insolvent. Neither are we prepared to hold that one who actually knows that a bank is insolvent, but does nothing except to draw his check and present it and receive payment over the counter in the usual course of business, would be required to refund the amount so withdrawn, less his pro rata share upon a final winding up of the affairs of the bank. As we understand this record, a decision of these questions is not necessary. But when a depositor with notice, or knowledge, or reason to suspect that a bank is insolvent, by collusion with the officers of a bank, receives payment of his check not in the usual course of business, and under such circumstances that payment to him gives him a preference over the other creditors, the depositor is guilty of a fraud upon the other creditors, and will be required to refund all of the amount so withdrawn by him, except what would be his proportion of the assets upon the winding up of the affairs of the bank. And especially would this be true in a case where the doors of a bank were closed and other depositors were not being paid and the depositor receiving his money was singled out as the sole depositor, or one of a select few, who were being paid, when the depositors, as a class, were not being paid in the order in which their checks were presented. It has been held that if a payment was made not in the ordinary course of business, when the bank was actually, though not avowedly, insolvent, the payee can not hold the amount paid to him, though he was ignorant of the bank's condition. 2 Morse on Banks (4th ed.), §625. Payment made by an insolvent bank, or made in contemplation of insolvency, with the intent to give a preference to a particular creditor, is void, irrespective of whether the insolvency was open and notorious or whether the payee knew of the insolvency or motive of the bank

in making the payment. Boone on Banks, §301.   Under our statute, however, it would seem that if the depositor, although paid not in the usual course of business, was ignorant of the insolvency and of the intent of the bank to prefer him, he would be protected and not required to refund. However, it would seem, under some circumstances, that payment out of the usual course of business would be a circumstance to be given great weight in determining whether there was notice; as a payment made with a view of giving a preference to a particular creditor is rarely, if ever, made in the usual course of business. See, in this connection, *Clarke* v. *Ingram*, 107 *Ga.* 565.

3. There was no evidence whatever authorizing the instruction of the judge on the subject of special deposits. The instruction of the judge, that if the defendant placed his money on deposit, and such action was induced by the officers of the bank, and if the insolvency of the bank was unknown to him, he would have a right to withdraw the money when he learned of the insolvency, was also unauthorized by the evidence; there being no evidence whatever that there was any inducement held out to him to make the deposit which he himself claims was a mere general deposit. The errors thus committed are of such grave nature, under the facts of the case, as to require a reversal of the judgment.

The assignment made by the president and cashier of the bank, without the authority of the board of directors, was admissible simply as a circumstance showing the insolvency of the bank; it being in effect an admission of both the president and the cashier that the bank was insolvent on the day of the transaction in question; but the rejection of this evidence probably would not have been alone sufficient reason for reversing the judgment.

> *Judgment reversed. All the Justices concur.*