## RUCKER v. KOKRDA.
### No. 870.

Circuit Court of Appeals, Tenth Circuit.
Dec. 11, 1933.

J. Paul Hill, of Brighton, Colo., for appellant.

C. L. Harrison, of Aurora, Colo., for appellee.

Before LEWIS, McDERMOTT, and BRATTON, Circuit Judges.

74

McDERMOTT, Circuit Judge.

Appellant carried a checking account at the First National Bank of Brighton. During banking hours he presented checks for his balance of $2,410.25 at the paying teller's window, which were paid in regular course partly in currency and partly by a draft. That night negotiations for a sale of the bank fell through, and the bank did not open the next morning.

Alleging that Rucker had been tipped off as to the failing condition of the bank by an assistant cashier, and that he cashed the checks in order to secure a preference over other depositors, the receiver sued at law for the amount of the checks and recovered judgment. This appeal brings on the question of whether the statute forbids a customer of a bank which turns out to have been insolvent from checking on his account while the bank is open and doing business in the regular way.

There is no substantial dispute in the evidence. Rucker had been a depositor in the bank for many years, his balance running from $500 to $3,000. Each fall he had checked out a considerable sum to make a trip to California. On November 16, 1931, while the bank was in substantially the same condition it was when he drew out the money two weeks later, he deposited $2,804.57, and made a $200 deposit as late as November 25. On November 30, a little after 10 o'clock in the morning, he presented checks for his balance at the window of the bank and they were paid. There is no proof and no finding that he had any inside information as to the bank's condition, nor was there any acute run on the bank the day he closed his account. The situation was the all too common one of a steady shrinkage in the value of the bank's assets because of slow or frozen paper, and a gradual loss of confidence in the bank accompanied by a slow drag on its deposits. Rucker undoubtedly shared the nervousness of the community about the bank, and withdrew his funds on that account, but that is all.

The bank was examined, in the usual course, on November 27. Its reserves were adequate, but bad paper was charged off in sufficient amounts to wipe out all except $1,-000 of its capital and surplus, and if depreciation had been taken on building and fixtures, the bank was insolvent. The bank examiner did not recommend nor direct that the bank be closed. The bank had made no assignment or transfer of any of its assets to any creditor, had not suspended any branch of its business, and had not dishonored any of its obligations. The officers knew its condition and offered to give the stock to one who could assume the liabilities. Late in the day of November 30, some of the directors withdrew their accounts. Because of the heavy withdrawals and lack of confidence of the community in the bank, a resolution was passed that afternoon to place the bank in the hands of the Comptroller for liquidation, the resolution to be used if the pending deal failed, which it did.

 There being no motion to test the sufficiency of the evidence to support the judgment, the statute precludes us from a review of that assignment of error. 28 USCA § 875; White v. United States (C. C. A. 10) 48 F. (2d) 178. The statute does, however, permit an examination into the question of whether the complaint and the facts as informally found by the trial court support the judgment. The complaint alleges a payment to a depositor in the regular course of business; and while the trial court found that the officers knew the bank was insolvent, it did not find 'that Rucker had information as to the bank's condition not shared by the community at large, and there is nothing in the record to justify such a finding. The record proper therefore presents the question as to whether a receiver may recover sums paid a nervous depositor who closes his account in the regular course of the banking business when it develops at the trial that the bank, although open for business, was insolvent and the officers knew it.

The statute under which recovery is sought is section 5242 of the Rev. St. (12 USCA § 91), and reads as follows (the symbols in parentheses are ours):

"(A) All transfers of the notes, bonds, bills of exchange, or other evidences of debt owing to any national banking association, or of deposits to its credit; all assignments of mortgages, sureties on real estate, or of judgments or decrees in its favor; all deposits of money, bullion, or other valuable thing for its use, or for the use of any of its shareholders or creditors; (B) and all payments of money to either, made (1) after the commission of an act of insolvency, or (2) in contemplation thereof, (a) made with a view to prevent the application of its assets in the manner prescribed by this chapter, or (b) with a view to the preference of one creditor to another, except in payment of its circulating notes, shall be utterly null and void; and no attachment, injunction or execution, shall be issued against such association or its property before final judgment in any suit, action, or proceeding, in any State, county, or municipal court."

Did Congress intend to avoid all payments made to depositors in the usual course of business if it later develops that the bank, while open, was in fact insolvent? Before attempting a line-by-line analysis of the section, two reasons immediately suggest themselves which negative any such intent. First, if Congress so intended, a single sentence avoiding all payments made when a bank is insolvent would have sufficed; that Congress hedged its mandate about with many qualifying clauses belies any such sweeping intent as appellee contends for. Second, the whole structure of the Banking Act, of which this is a part, is designed to inspire confidence in depositors, to the end that the moneys of the community might be turned into channels of trade. If this section is construed to avoid payments to depositors in regular course, Congress has injected a justifiable apprehension into the minds of the depositors whose fears it has constantly endeavored to allay. There would be little confidence left in our national banks if a depositor knew that even if he got his money out before the bank closed, he might be harried with later suits to redeposit it.

While the statute is somewhat confusing, we do not find in it such far-reaching intent. There being no transfer or assignment of any securities in the present case, part (A) of the section has no application. The payment was one of money and comes within part (B). Such payments are avoided only if certain conditions exist. First, if made "after the commission of an act of insolvency." While it is here contended that the bank was insolvent when the payment was made, the condition is not insolvency but is that "an act of insolvency" has been committed. There is no evidence or finding of any act of insolvency in this case prior to the payment. Second, the payment may be avoided if made "in contemplation" of an act of insolvency. When this payment was made, the decision to close the doors on the following morning had not been reached; that decision was not arrived at until late that night. True, the officers knew that unless new money was interested, or confidence restored, the bank could not indefinitely meet its customers' demands; but when this payment was made, the officers were hopeful that the negotiations of the night would avert the necessity of an act of insolvency. This payment was therefore not made in contemplation of the later act of insolvency. But this is not all; not only must the payment meet either condition (1) or (2), but it must also meet either condition (a) or (b), that is, be made either with a view of

preventing the application of its assets as provided by the Banking Act or to prefer one creditor over another. The Banking Act contemplates that depositors should be paid on demand; paying a depositor's check on presentation can therefore scarcely be said to be outside the contemplation of Congress in creating national banks; nor can there be a purpose to prefer one depositor over another when the payment is made at a time when all depositors are being treated exactly alike, the checks of all being paid on presentation. Whether such an intent to prefer might exist if it were definitely known that the bank would not open on the morrow, is not before us.

Appellee then argues that the courts have construed the section so as to cover this case. We do not so read the authorities. Of those cited as controlling, the following involve a transfer of securities to a depositor, and are within clause (A) of the section: National Security Bank v. Butler, 129 U. S. 223, 9 S. Ct. 281, 32 L. Ed. 682; First Nat. Bank of Ortonville v. Andresen (C. C. A. 8) 57 F. (2d) 17; Roberts v. Hill (C. C.) 24 F. 571, 574; Ball v. German Bank (C. C. A. 8) 187 F. 750, 753; Brill v. McInnes (C. C. A. 8) 14 F.(2d) 306; Varden v. City of Corbin (D. C. Ky.) 2 F. Supp. 840; Bodley v. Bowman, 131 Kan. 741, 293 P. 740. These cases hold that where a depositor's check has been dishonored, and he accepts a transfer of a mortgage or other securities of the bank for his deposit, such transfer may be avoided despite his lack of knowledge of the bank's condition. Such a transaction could only occur after the depositor had been denied the cash, which is in itself an act of insolvency. Furthermore, transferring securities to a depositor necessarily involves a preference, since manifestly all depositors cannot be given securities of the same value. That a distinction exists between such cases and the one at bar is disclosed by an excerpt from Roberts v. Hill, supra, relied on strongly by appellee. The court there said:

"A case may be supposed where a bank is hopelessly insolvent, and is known to be so by its officers, and when any payment made by it will, as they know, necessarily result in a preference to the person receiving it; and yet, if made in the ordinary course of business, as for instance to a customer, who, in ignorance of the condition of the bank, continues his dealings and makes daily deposits, and draws out checks daily, it would be extremely inequitable to compel the latter to pay it back. Under such circumstances the bank

or its creditors would receive the benefits of his deposits, while he would be compelled to repay what he had drawn out innocently, and in the usual course of business. It would be a harsh statute which would compel a creditor or depositor, under such circumstances, to yield up the payments he received in good faith. A construction which would give such an effect to this statute ought not to be indulged, in the absence of clear and explicit language requiring it. But the transaction on the part of McGregor was not an ordinary one. It is extremely unusual for a depositor of a bank to demand security as a condition of allowing his money to remain."

And in Ball v. German Bank, supra, the court carefully marked the distinction in these words:

"The bank was not then continuing in the due and ordinary course of its business, as appeared to be the fact in McDonald, Receiver, v. Chemical National Bank, 174 U. S. 610, 19 S. Ct. 787, 43 L. Ed. 1106."

In National Security Bank v. Butler, supra, the court took pains to point out that the payment was made two days after the bank had "actually failed and stopped business."

In Hirning v. Federal Reserve Bank of Minneapolis, Minn. (C. C. A. 8) 52 F.(2d) 382, 82 A. L. R. 297, payments were made to the Federal Reserve Bank after the bank was closed by resolution of its board of directors. In Federal Reserve Bank v. Omaha Nat. Bank (C. C. A. 8) 45 F.(2d) 511, apparently one bank was kept open until an elaborate scheme could be worked out through which a closely related bank could withdraw its account in full. In Vann v. Federal Reserve Bank of Richmond (D. C. Va.) 47 F.(2d) 786, a representative of the Federal Reserve Bank called at a correspondent bank to collect certain checks and was informed that the bank could not pay them—an act of insolvency. He advised that a national bank examiner be called, and while waiting for him, secured payment of his checks. In American Surety Co. v. Jackson (C. C. A. 9) 24 F.(2d) 768, a cashier of a bank, knowing it was not to open in the morning, withdrew a large deposit in currency, and later restored it. Cases where withdrawal is made after an act of insolvency, and with an intent to give and receive a preference, are not applicable to the case at bar.

The one case which involves a transaction had in the usual course of banking business, and which strongly supports the position of appellant, is McDonald v. Chemical National Bank, 174 U. S. 610, 19 S. Ct. 787, 790, 43 L. Ed. 1106. There the Capital National

Bank of Lincoln, Nebraska, suspended business on January 21. Remittances for that bank's credit were mailed to the Chemical National Bank prior to the closing of the bank, but received and retained afterward. The receiver sued to recover these remittances from the Chemical Bank, basing his action on the statute here invoked. The Supreme Court held that there could be no recovery, and said:

"Nor can a finding that the payments and remittances made to the Chemical National Bank on the dates above mentioned were made in contemplation of insolvency, and with an intent to prefer that bank, be based on the mere allegation that the Capital National Bank was actually insolvent, and that its insolvency must have been known to its officers. It is matter of common knowledge that banks and other corporations continue, in many instances, to do their regular and ordinary business for long periods, though in a condition of actual insolvency, as disclosed by subsequent events. It cannot surely be said that all payments made in the due course of business in such cases are to be deemed to be made in contemplation of insolvency, or with a view to prefer one creditor to another. There is often the hope that, if only the credit of the bank can be kept up by continuing its ordinary business and by avoiding any act of insolvency, affairs may take a favorable turn, and thus suspension of payments and of business be avoided."

The situation so described is the one presented by this record. The court further said that there was no act of insolvency shown since the bank had not failed to pay any depositor on demand up to the hour of closing. Then comes this significant statement of the court, a part of which we italicize:

"It may be that those of its officers who knew its real condition must have dreaded an ultimate catastrophe, but there is nothing to justify the inference that the particular payments in question were made in contemplation of insolvency, or with a view to prefer the defendant bank. The Chemical National Bank was no more preferred by these remittances several days before suspension *than were the depositors whose checks were paid an hour before the doors were closed.*"

The Second Circuit Court of Appeals, whose decision was affirmed in the McDonald Case, pointed out that:

"The section does not invalidate every payment made by a national bank, except of its circulating notes, after it becomes insolvent, or even after its managers become aware of

its insolvency. If it had been intended to do so, that intention could have been readily declared in short and plain terms. * * *

"Treating the remittances as payments, made at the time they were mailed, the case presents the question whether payments made in the ordinary course of business by a national banking association, which is doing business as usual, to a creditor who received them innocently, are void if it turns out that the association at the time had become in such sense insolvent that its debts were greatly in excess of its assets, and its officers knew or should have known the fact, and knew or should have known that probably at no very distant day it would be obliged to suspend. If they are void, creditors of national banks, whether ordinary customers, depositors, or other banks who acquire their drafts, or advance them funds in expectation of remittances, are on a very precarious footing, and cannot safely have any dealings with them." Hayden v. Chemical Nat. Bank (C. C. A. 2) 84 F. 874, 875, 876.

In Browne v. Stronach (D. C. Mont.) 7 F.(2d) 685, it appeared that there were cash withdrawals from an account in regular course, and a transfer of real estate in satisfaction of the balance of the account. The receiver sued to set aside the transfer, but not to recover cash withdrawals, his position being that withdrawals by a depositor in the usual course of business were not prohibited by the statute. In McGregor v. Battle, 128 Ga. 577, 58 S. E. 28, 13 L. R. A. (N. S.) 185, it was held that recovery could not be had against a depositor who was paid in regular course without knowledge that he was being preferred over other creditors. For other state cases, see note, 13 L. R. A. (N. S.) 185.

No case has been cited, and we have found none, where recovery has been had under this statute from an uneasy depositor who withdraws his deposit in regular course while the bank is open and doing business as it was when he deposited the money. That is all the facts in this record disclose. The McDonald Case denied relief in a stronger case than this; the language of the opinion covers the case at bar; its authority has never been impaired; on the contrary it has been frequently cited with approval. Nor do we see the justice of a position which seeks to recover withdrawals made in regular course while the banking department permits a bank to remain open, while retaining deposits made under the same circumstances.

We are of the opinion that the payment to Rucker was not prohibited by the language or the intent of the statute. The judgment is accordingly reversed and the case remanded for further proceedings not inconsistent herewith.

Reversed and remanded.