## PRENTISS v. CHANDLER.*

## SAME v. TIMES–MIRROR CO.

### Nos. 8031, 8032.

Circuit Court of Appeals, Ninth Circuit.

Sept. 23, 1936.

*Rehearing denied Nov. 16, 1936.

Rollin L. McNitt, of Los Angeles, Cal. (Edythe Jacobs, of Los Angeles, Cal., of counsel), for appellant.

T. B. Cosgrove, F. J. O'Neil, and Richard G. Adams, all of Los Angeles, Cal., for appellees.

Before WILBUR, GARRECHT, and HANEY, Circuit Judges.

GARRECHT, Circuit Judge.

We are here concerned with an appeal from a judgment dismissing an action instituted by H. F. Schilling (predecessor of William Prentiss, Jr.), as receiver of the United States National Bank of Los Angeles, against the appellee Harry Chandler in case No. 8031 and also a similar appeal in case No. 8032 in an action brought by the same receiver against the Times-Mirror Company.

The complaints were filed on the same day. The cases were not consolidated, but were set down on the same day for trial in the court below. By stipulations made during the trial and at the close of the first case it was agreed that the evidence offered by plaintiff might be considered as applicable to both cases. We are accordingly passing upon the two appeals jointly.

The actions were tried by the court following a waiver of jury trial. At the close of the testimony offered on behalf of the appellant, the appellee moved for general findings in favor of each of the defendants and to grant and enter a judgment of nonsuit, and dismiss the action, and for judgment for the appellee in each. The motion was granted and judgment entered. The correctness of the rulings on the motion is the principal question presented on the appeal. Rulings of the court

sustaining objections of the appellee to the introduction of testimony and other rulings overruling objections of appellant are also assigned as reversible error.

The actions were brought to recover from Harry Chandler, in one case, and the Times-Mirror Company, in the other case, a certain sum paid to each on August 11, 1931, on time certificates of deposit, none of which was due. These actions were brought under United States Revised Statutes, § 5242 (12 U.S.C.A. § 91), the portion of which, material to the question here, provides that payment of money by a national bank "made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another, * * * shall be utterly null and void."

The facts relied upon to support the allegations of the complaint are as follows:

The Los Angeles Clearing House Association had made an examination of the bank and prepared a report, dated August 15, 1930, which was brought to the attention of the directors of the bank as early as October 29, 1930. The report criticized the unsatisfactory condition of many of the loans of the bank and the lack of supporting evidence of the financial responsibility of many of the largest debtors.

Between September 19, 1930, and October 22, 1930, national bank examiners studied the bank's condition, and brought it to the attention of the directors on November 26, 1930. In commenting on the condition of the bank in this report, the examiners indicated that certain losses should be charged off; certain other assets were listed as slow and doubtful; specific criticisms were made of other loans; the manner in which some accounts had been kept was censured; changes in conducting the trust department were suggested and the propriety of carrying the "Ferguson Trusts," hereinafter discussed, was raised.

At the January 28, 1931, meeting of the directors, attention was again called to the report of the examiners and a letter in relation thereto from the Comptroller of the Currency of the United States, dated November 26, 1930, was read.

At a special meeting on February 2, 1931, the directors again reviewed the Clearing House report and a supplemental report. These reports apprised the directors of the fact that no improvement had been made in the condition of the bank, but that its loans and discounts were in a worse position than at the time of the August report. In the afternoon of the same day, at the special meeting of the board of directors, the president and the executive vice president of the bank conferred with the Los Angeles Clearing House committee and a proposed plan was outlined to the committee whereby funds might be secured, by means of which the criticized paper could be taken out of the bank, and cash substituted therefor.

In March, 1931, the proper officers of the bank were authorized to communicate with the Comptroller of the Currency of the United States, and in May other plans for reorganization were discussed. At the meeting of the directors of June 24, 1931, the directors voted to omit the usual dividend of June 30th.

On July 10, 1931, written demands on the United States National Bank by the receiver for the Ferguson Trusts were made, charging the bank with certain violations of the agreement of trust and with the unlawful diversion of trust funds.

At the regular meeting of the board of directors on July 29, 1931, a letter from the Comptroller of Currency, under date of July 2, 1931, was read to the board.

In this letter the Comptroller of Currency commented on the report which National Bank Examiner Lamm had submitted concerning the condition of the bank. Among other things, the Comptroller wrote: "The bank's condition from the standpoint of undesirable assets is decidedly unsatisfactory, and as the examiner states presents a serious problem."

The letter then goes on to express the hope that the directors will devote themselves diligently and untiringly to the business of making such changes in operating policies and management as are necessary to insure successful operation in the future. The Comptroller also expressed a desire to be kept closely informed regarding the situation of the bank and directors were requested to submit monthly reports beginning July 15. Pursuant to these requests of the Comptroller a letter dated July 29, 1931, was sent forward, signed by O. M. Souden, chairman of the board. This letter reviews the affairs of the bank in some detail, particularly with reference to the

departments that had been criticized in the report of the examiner. The letter also outlined the manner in which improvements had been made and to it was appended a memorandum showing the condition as of July 15, 1931, of the loans that had been criticized, together with the current appraisals. At this meeting special counsel were employed to give an opinion as to the possible liability of the bank in relation to the Ferguson Trusts.

The controversy concerning the Ferguson Trusts and the possibilities of settlement were under discussion by the attorneys for the respective parties during the month of July. In the early part of August a representative of the Comptroller's office was advised of the situation. On August 5, 1931, a conference was held, after which the attorneys for the bank advised that there was a liability on behalf of the bank in connection with the Ferguson Trusts claim, and also that suit was being withheld as a matter of public policy, pending efforts to arrive at a settlement.

At the conference Mr. Lamm, the bank examiner, stated that from his analysis " * * * the whole thing resolved itself into one thing; favorable compromise, speedily made, which would preserve the integrity of the institution."

Thereafter further negotiations were had with the result that the Ferguson Trusts agreed to accept $400,000, in cash, plus another $100,000, which $500,000 was to be paid to the receiver out of certain assets that the bank was to put into an investment company or out of the first money received in the liquidation of those assets. At this conference it was mentioned that in order to perfect the settlement, an agreement by the bank would have to be made with some outside person in order to secure the $400,000. It was also stated that the bank officials were then dealing with a group headed by a Mr. Bell, which was to furnish the new money.

On August 10, 1931, Bank Examiner Lamm was advised that the bank association contemplated sale of the bank to Mr. Bell, which proposed transaction was outlined and which indicated that the plan contemplated also included the settlement of the Ferguson Trusts. It was suggested that, instead of Bell purchasing the stock of the bank as proposed, it would be better that a new bank be organized by Mr. Bell. Mr. Lamm, the bank examiner, recommended to the Comptroller that Mr. Bell

be granted a charter. This was refused on August 15, 1931.

A meeting between a committee from the board of directors of the United States National Bank and a special committee from the Clearing House Association was held on August 6, 1931, for the purpose of securing the aid of the Clearing House. At the close of this meeting and as they were adjourning, one of the representatives of the Clearing House remarked, "Gentlemen, you may not realize it, but there is a quiet run going on against your bank at this moment."

There was evidence that for some time withdrawals were being made in excess of deposits, which steadily diminished the amount of cash on hand.

D. W. Pontius, one of the bank directors, called by the appellant, testified that his attention was first directed to the Ferguson Trusts along in February, 1931. After appointment of receivers for the trust, there was some fear that the matter would be given publicity in the newspapers, which would cast reflection on the bank. Thereafter the witness, with Mr. Weidner, president of the bank, went to see Mr. Chandler, who was a dependable man of influence and prominence, not only in the city, but elsewhere, and who was conducting large newspapers. The witness said to Mr. Chandler: "If there is anything published about the 'Ferguson Trusts' it won't be to the best interests of the bank." He asked Mr. Chandler to use his best efforts to see that nothing appeared in the newspapers. The witness further said: "I might have discussed with him at that time that if this thing got along far enough to go to the Clearing House Association—to talk to them—I might have said to him there, 'Mr. Chandler, won't you talk to Mr. Chaffey in connection with anything that might occur in this bank?' But at the same time I knew in my own mind that the bank would not be closed, and that there was no chance of it closing; and all of my evidence and all of my records show that there was no chance of the United States National Bank closing until the morning that it was actually closed; and I offered the resolution closing the bank." He testified that this conversation with Mr. Chandler was held some time in April or May. Later, the transcript recites the following as the testimony of the same witness: "The bank was not in difficulties at all at that time; they

went over and talked to him in a general way about the condition of the bank; that the bank was not in trouble then at all, * * * that no troubles came to the attention of the witness after May 25th until about August 17th; that as far as he can recall he was not present at the special meeting of August 6th." Moreover, he said that this conversation with Chandler was not after August 6, 1931, but that it was prior to June 1, 1931. He said he fixed the time from the fact that he made this call on Mr. Chandler before he had prepared the documents which he presented to the board of directors whereby they agreed to subscribe $100,000 for the purpose of taking the bad paper out of the bank. This document was prepared on May 25, 1931, and it was all signed prior to June 9, 1931, Pontius said.

He further testified that he was given to understand by the president and manager of the bank that if the directors raised $100,000 among themselves and took some of the doubtful paper out of the bank, the bank would continue to operate permanently, notwithstanding the Ferguson Trusts claim.

There is no evidence that at the time the withdrawals were made, the appellees had been advised by anyone connected with the bank that there was any likelihood of its suspension.

The only evidence of any of the bank officials having discussed bank affairs with appellees was the conversation of Director Pontius, wherein he requested Chandler to use his influence to withhold publicity of any suit by the receiver of the Ferguson Trusts in case it was instituted, because the claim for $4,000,000 was such a large amount that the mere bringing of such a proceeding might have an unfavorable reaction upon the bank. Mr. Pontius testified that at the time he had this talk with Mr. Chandler he did not know that either Chandler or the Times-Mirror Company had any money on deposit in the bank, and that he believed the bank to be in no danger of being closed.

It is emphasized as a ground for suspicion that these certificates were presented before due and that the officer to whom these certificates were presented before paying them asked the president of the bank if payment should be made without insisting on time after notice given, which could have been required under the provisions of the certificates. The evidence is to the

effect that theretofore no such notice had ever been asked of any depositor and that payments were made in due course as had been the custom of the bank, and it does not appear that the officers, at the time the certificates were paid, had a design of preferring the appellee Chandler, or entertained any belief that the bank was soon to suspend.

Concerning the cashing of the Time Certificates of Deposit of the Times-Mirror Company and of the appellee Chandler, the witness, Assistant Cashier Stern, testified that on August 11, 1931, about 11 o'clock in the forenoon, the certificates held by the Times-Mirror Company, of which appellee Chandler was the president, were presented with a request for payment. The witness could not definitely remember who presented them but he thought it was Mr. Pfeffinger, the treasurer of the Times-Mirror Company. The request was for a cashier's check with interest included. Because of this demand for interest the witness asked to have the certificates of deposit left for a short time to enable him to take this interest matter up with another officer of the bank.

The witness testified that he was instructed to take up large withdrawals made during the period from August 1 to August 18 with executive officers of the bank. In this instance he took the matter up with Mr. Weidner, knowing that he had introduced the account and was friendly to the gentlemen concerned, also because it was a large withdrawal; and, further, because the bank always had the right to demand of time certificate of deposit holders notice for a certain length of time if the certificate was not due. Inasmuch as withdrawals were quite heavy, the witness did not know but the bank might require the notice, although he had never had discussion with any one with reference to making a demand for time. There was, however, such a possibility.

The witness testified that the practice with reference to paying interest before maturity usually was that the interest was paid at six-month periods, provided the certificate was made out to cover a period of six months or more. The Times-Mirror certificates were for different dates and a full six months interest was not due. And when a cashier's check covering these certificates and interest to date was asked for, the witness did not feel that he should act on his own responsibility, and he want-

ed to consult some other officer, particularly Mr. Weidner.

In regard to the interest, the person who presented the Times-Mirror certificates said that it was not necessary to determine that question at once, but that any interest could be adjusted at a later date. The certificates were left, however, and the witness took up the matter of their payment with Mr. Weidner. After talking to some one on the telephone, Weidner said: "I am informed that they have a commitment of a considerable size to meet, and that as the money has not come in as they had anticipated that it was necessary that they make the withdrawal of the funds from the bank." This occurred about noon.

During the lunch hour, while the witness was out, the Harry Chandler certificate was left at the bank. This certificate was not presented to him at the time when the certificates of the Times-Mirror Company were presented; it was there when he returned from lunch. He did not see it presented, but he signed the check and delivered it to a representative of Mr. Chandler. Interest was not paid on the Times-Mirror Company certificates; the check was drawn after the witness' conversation with Mr. Weidner, but the assistant cashier did not remember having delivered the check to any one.

The witness testified that he was keeping in daily touch with the financial situation in the bank, commencing in August, 1931, in regard to withdrawals; that he knew the withdrawals were heavy and believed that if the withdrawals kept on and new capital did not come in, there was a possibility of the bank's suspending, although he believed the institution was financially sound; that he pursued the ordinary course of handling this matter on August 11th, as far as large withdrawals were concerned. During this period the bank had not required notice of presentation prior to the due date of the time certificates. The assistant cashier further testified that he did not know or have any intimation that these certificates were to be presented for payment, and that at the time they were presented the bank was conducting its business in regular course.

The appellant also called a number of other bank officials, who testified that while they realized that it was possible for this bank or any other bank to suspend, they did not think that there was any probability that this bank would do so. They explained that they were confident that they would receive support from the Clearing House Association. They believed this up to ten minutes of ten of August 18, 1931, at which time Mr. Johnson, who was representing the board of directors of the bank at a session of the Clearing House, reported by telephone that the Clearing House Association would do nothing. Thereupon, after a short discussion by the directors, it was decided to close the bank.

The many reports of government bank examiners and correspondence with the Comptroller of the Currency take up most of the record. These were offered for the purpose of showing that the bank was insolvent at the time the payments here involved were made and to bring home this knowledge to the directors. Particular emphasis is placed on a phrase quoted from one report, as follows: "Laden with slow; and burdened with doubtful assets the Bank presents a serious problem." This particular report was read to the directors on June 24, 1931. Thereafter, about the 1st of August, the chairman of the board of directors made a report to the Comptroller which indicated an earnest effort to comply with the suggestions for improvement of conditions and clearly shows that the officers were not anticipating closing the bank.

More than that, these bank examiners and the Comptroller of the Currency were in closest touch with the bank situation to the day of suspension and no such action had been suggested. These officials, like the officers of the bank, apparently believed that the bank eventually would overcome its difficulties.

It was stipulated that all evidence before the court might apply as well to the case against the Times-Mirror Company. Plaintiff then rested in both cases. Thereupon counsel for defendants interposed the following motion:

"If your Honor please, for the purpose of testing the sufficiency of the evidence, the defendant Harry Chandler in the one case and the defendant The Times-Mirror Company in the other case now move the court at the close of the testimony in chief offered on behalf of the plaintiff and after the plaintiff has rested his case and prior to the introduction of any testimony on behalf of the defendant to make general findings in favor of each of the defendants and to grant and enter a judgment of nonsuit against the plaintiff and in favor of

the defendant in each case and to dismiss the actions as against the defendants and to enter judgment for the defendants in each of the cases on the following grounds and each one thereof:

"1. The plaintiff has not shown facts sufficient to entitle him to recover;

"2. The evidence is not sufficient to support a judgment in favor of the plaintiff and against the defendants;

"3. The evidence is not sufficient to support a finding that the payment of the sums of money mentioned in the complaints in each of the cases by The United States National Bank of Los Angeles to the defendants on the 11th day of August, 1931, was made by said bank after the commission of an act of insolvency by said bank, or in contemplation of an act of insolvency by said bank, or with a view of preventing the application of its assets in the manner provided by law, or with a view to the preference of one creditor to another;

"4. That the evidence is not sufficient to show that at the time that the payment of the sums of money mentioned in the complaints, or either of them, was made by The United States National Bank of Los Angeles to the defendants, or either of them, on the 11th day of August, 1931, the financial condition of said bank was such that an act of insolvency was imminent;

"5. The evidence is not sufficient to show that said payment was actuated by the knowledge on the part of said bank, or any officer thereof, or the insolvency of said bank, or that said payment was influenced in any manner by such knowledge.

"The evidence discloses that said payments, and each of them, was made in the ordinary course of business of said bank."

The trial court sustained the aforesaid motions and rendered judgment against plaintiff on all grounds stated, from which judgment this appeal.

■ From the cases cited by appellant and the reading of the statute (12 U.S.C.A. § 91), it is clear that the purpose of the enactment was to guard against the wrongful or preferential disposition of the assets of a bank known to be or about to become insolvent.

The statute says all payments of money to creditors, "made after the commission of an act of insolvency, or in contemplation thereof, made * * * with a view

to the preference of one creditor to another * * * shall be utterly null and void." It was stipulated at the trial that this bank "was receiving deposits and paying out money and transacting the usual and ordinary banking business. And that for a week after these withdrawals."

■ The knowledge and intent required to avoid a transfer relate to the knowledge and intent of the officers making the transfer. Here there is no showing that on the day the money was withdrawn the bank was actually insolvent or that there was any expectation that the bank would close. The testimony of all the bank officials is to the contrary. There was no showing of preference, nor would the evidence sustain any finding that any knowledge of the impending suspension of the bank had been imparted to these depositors by any official of the bank.

The officer who paid out the money to appellee testified that he pursued the ordinary course of handling such matters; that the bank had not theretofore, in handling certificates of deposit, required notice of presentation prior to due date of the time certificates; that the officers had no intimation that the certificates would be presented until they were actually tendered for payment.

At the time of the presentation of the certificates and payment of the money to appellees, the bank was conducting its business in regular course and continued to do so for a week thereafter. The evidence sustains the view that these payments were made in the usual course of business, uninfluenced by the state of the bank's pecuniary affairs.

Of the cases cited by the appellee we refer to the following decisions which support the judgment of the District Court: Rucker v. Kokrda (C.C.A.10) 68 F.(2d) 73; Collins v. School District (C.C.A.3) 72 F.(2d) 339; and Nelson v. Lewis (C.C A.2) 73 F.(2d) 521.

Collins v. School District, supra, affirms that in cases brought under Rev.Stat. § 5242 (12 U.S.C.A. § 91), where the transaction involved is alleged to be a preference made in contemplation of insolvency, the burden of proof is upon the receiver to show that the directors of the bank intended or had in view as a purpose, or as a future event, the insolvency of the bank at the time the transaction took place. In the case at bar the District Court deter-

mined that there was no such intent and purpose.

In the other decisions noted, many of the cases cited by appellant are carefully analyzed and commented upon, so as to make them easily distinguishable when sought to be applied to this case.

Upon the argument and in the brief, the appellant stressed the more recent case of Mechanics Universal Joint Co. et al. v. Culhane et al. (C.C.A.7) 80 F.(2d) 147. The controlling facts in that case, as recited in the opinion, are different from those in the case at bar. There the president of appellant, who caused the funds of the company to be withdrawn from the bank on Saturday, June 13, was also a director of the bank and knew at the time that the cash position of the bank was such that it could not stand a run of one business day and that the bank officers anticipated that such a run would occur on the following Monday. The check was drawn one day before the bank closed, and paid through the clearing house the day it closed. There were many other facts disclosed, all of which clearly showed a violation of section 5242 of the Revised Statutes (12 U.S.C.A. § 91).

In this case we cannot say that the District Court was wrong in holding that the evidence failed to show that the officers of the bank knew of its insolvency at the date of the withdrawals; or that the payment of the certificates as far as the bank was concerned was not made in due course of business, uninfluenced by the state of the bank's affairs; or that there was an intent to prefer the appellees.

We therefore concur in the finding of the court below: "That the evidence, and all reasonable inferences to be drawn therefrom, is insufficient to prove that the payment by the bank of the money sought to be recovered herein, was made after the commission of an act of insolvency or in contemplation thereof, nor made with the view to prevent the application of its assets in the manner prescribed by law, or with the view to the preference of one creditor to another, as provided in United States Revised Statutes, § 5242 (12 U.S.C.A. § 91) * * *."

From the showing made we are convinced that at the time the payments were made the officers of the bank did not contemplate the insolvency of the institution and that the payments were not made with the view of preferring these creditors.

That the foregoing conclusion was inevitable upon the evidence admitted is almost conceded in appellant's further argument in support of certain assignments of error based upon the exclusion of proffered evidence, which it is claimed was essential to sustain appellant's contentions here made. We come now to consider these exceptions.

The appellant has specified as error the exclusion by the trial court of the complaint, answer, and memorandum of conclusions and order for judgment in the case of Receiver of the United States National Bank v. A. Sieroty and Bertha Sieroty, which were offered by plaintiff to show that in another and similar action, wherein the same bank was involved and a violation of the same statute was in issue, the court found that, on a date shortly prior to the date of payment to or withdrawal by defendant, an act in contemplation of insolvency was committed by this bank by making other payments in violation of this statute.

Counsel for defendants when the offer was made interposed the following objection: "We object to the introduction in evidence of the pleadings or any of the pleadings in a case which has no bearing upon this case at all, so far as the pleadings in the case are concerned. I can't understand upon what theory anyone would consider that the case was relevant; but it has been mentioned here several times during the trial of this case, undoubtedly to bring before your Honor the circumstance that Judge James in another case brought by this same receiver has found in his memorandum decision against the defendant Sieroty. We are quite willing, and as a matter of fact we are anxious, that the court read the opinion of Judge James in that case. We will call it to your Honor's attention and furnish your Honor with a copy of that. We are willing that the court be furnished with a copy of the transcript of the evidence, if you wish to consider it, in the Sieroty case; and we would be glad to furnish that. But we think that so far as the evidence in this case is concerned, that the pleadings in a case in which the defendant Harry Chandler and the defendant Times-Mirror Company were not parties has absolutely no relevancy to the issue raised by the complaint against them."

The evidence in that case is not before the court. Admittedly the decision in an-

other action, to which defendant in this case was not a party, is not res judicata here. The pleadings offered do not constitute evidence in this case. Their exclusion by the court was correct.

A number of questions were propounded to the assistant cashier who signed the checks in payment of the time certificates for the alleged purpose, as asserted in the appellant's brief, of showing the intent and knowledge of this officer that these payments would operate as preferences.

In the assignments of error and in the brief it would appear as if the questions and objections occurred consecutively. In fact, they are scattered through many pages of the record and their separate discussion would extend the opinion to unreasonable limits, and serve no valuable purpose. It also appears from the record that other testimony of the entries supplies facts sought to be addressed by the questions ruled objectionable. As the ruling of the court, we quote the following excerpt from the record:

"Q. By Mr. McNitt. Did you have in mind that payment of these two withdrawals that have been the subject matter of this examination might constitute a preference on the part of the bank?

"Mr. Cosgrove. We do object to that question, if the court please, on the ground that that is what this court is here for the purpose of determining.

"The Court. Yes—the facts.

"Mr. McNitt. If your Honor please, we are entitled to know what was in the mind of this witness.

"Mr. Cosgrove. Well, you are entitled to know what was in the mind of this witness, if his acts were an indication of what was in his mind, yes. But the court is here for that very purpose. That is the ultimate fact to be found, as to whether or not this payment was a preference. Now, to ask a witness that is a clear invasion of the province of the court.

"The Court. Yes. Objection sustained. Note an exception."

"Thereupon the following question was asked and the following proceedings had:

"Q. Did you discuss with Mr. Weidner the fact that those withdrawals might constitute a preference to Mr. Chandler and to The Times-Mirror Company?

"Mr. Cosgrove. I object to that question, if the court please, for the same reason.

"The Court. Objection sustained.

"Mr. McNitt. We note an exception. That is all."

The objections were placed upon the ground "that this is what the court is here for the purpose of determining." That is, the ultimate fact to be found, as to whether or not this payment was a preference.

The judge sustained the objections on the theory that these questions were an invasion of the province of the court and that the question of what constituted a preference was a conclusion of law to be drawn by the court from evidentiary facts and therefore any assumption by the witness as to what constituted a preference was not admissible. On this theory which appellant did not clearly controvert it cannot be held that the ruling was wrong.

Furthermore, this witness, in other portions of his testimony, revealed his attitude of mind and the subject of his conversation with Mr. Weidner. This is shown by the following excerpts from the record:

"The witness testified that he was instructed to take up large withdrawals made during the period from August 1st to August 18th with executive officers of the bank; that he doesn't remember whether it was Mr. Johnson or Mr. Weidner, but he either wrote the name of the individual or concern making the large withdrawal on a sheet of paper or slip, and he usually placed those on Mr. Johnson's desk. In this instance, he took the matter up with Mr. Weidner, knowing Mr. Weidner had introduced the account and was friendly with these gentlemen, and because it was a large withdrawal and the bank always had the right to demand on certificates of deposit that they be given a certain length of time or notice if the certificate is not due. They also had the right in savings to demand certain notice. Inasmuch as withdrawals were quite heavy, the witness didn't know but what they might make a demand of this sort, although he had never had any discussion with anyone with reference to making a demand for time; but there is always that possibility."

"In response to the question whether it had occurred to him on August 11th that the bank might ultimately suspend,

the witness testified that he didn't know as it would be on that particular day, but he believed that if the withdrawals kept on and new capital didn't come in, there was a possibility of the bank suspending, although he believed the institution was sound financially; * * *

"He could not say that August 11th was the first time he thought there was a possibility of the bank suspending, but he knew that if the heavy withdrawals kept on there had to be a stopping place somewhere, and if they kept on that way there was only one thing that could happen; the bank would either have to have new capital or they would have to suspend; that was inevitable."

With the foregoing testimony in the record the answers would have been merely cumulative, and even if improperly excluded the same would constitute harmless error.

■ Other errors assigned relate to the refusal of the court to permit Edythe Jacobs, one of the appellant's attorneys, to testify for the purpose of impeaching Mr. Pontius, appellant's own witness, alleged to have shown himself hostile. As pointed out by the Court, no proper foundation for impeachment had been laid. There was no error in the ruling.

■ Likewise there was no error in permitting witness Pontius to refresh his memory from memorandum prepared by him at the suggestion of the appellants' counsel as to datas and other matters upon which he was to testify.

The witness stated what documents had been consulted in arriving at the dates upon which certain conversations took place, some of which documents referred to were in court. He further stated that by consulting the memorandum before giving his answers to the questions his memory would be refreshed so that he could be more sure of the correctness of his statements and he knew that the memorandum was correct. In these circumstances it was proper for the court to permit the witness to refresh his memory by consulting the memorandum before testifying.

■ Nor was there error in refusing to permit the receiver as an expert to express an opinion as to solvency of the bank at the time of the payment of the deposits. He was permitted to give the figures and accounts upon which his opinion was based. It was then for the court to determine what conclusion should be drawn therefrom.

In the case of Kullman & Co. v. Wooley (C.C.A.) 83 F.(2d) 129, 132, cited by both parties, it was said: "But to void a payment or transfer it is not enough that it occurred after an act of insolvency or in contemplation thereof, because the statute does not end its description there. It adds as a further description of the nullified act: 'Made with a view to prevent the application of its assets in the manner provided by this Chapter or with a view to the preference of one creditor to another.'"

Appellants having failed to establish any grounds upon which the judgments entered in these companion cases should be set aside, they are affirmed.